**PERMA RESEARCH & DEVELOPMENT COMPANY, Plaintiff,**

**v.**

**The SINGER COMPANY, Defendant.**

**No. 66 Civ. 665 KTD.**

United States District Court,
S. D. New York.

April 11, 1975.

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, *for plaintiff*; Paul R. Grand, Paul R. DeRensis, New York City, *of counsel*.

Winthrop, Stimson, Putnam & Roberts, New York City, *for defendant*; Terence H. Benbow, Elizabeth M. Taylor, Eugene G. McGuire, Jonathan K.

Lagemann, Rebecca H. Rawson, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

This case has had a long and tortured history. It was instituted on March 9, 1966, and the operative facts go back several years prior to that time. The trial spanned eight months and included many thousands of pages of exhibits.

Basically, it is a breach of contract action, plaintiff and defendant having entered into two contracts, one on June 18, 1964, the other on December 21, 1964. By judicial curtailment of the issues, only the breach of the December 21, 1964 contract was the subject of the trial but in order to put into perspective all of the claims, counterclaims and defenses of the parties it is necessary to review the negotiations leading to the June 18, 1964 contract, the relationship of the parties while operating thereunder, and particularly the knowledge gained by the defendant during the period starting with the negotiations leading to the June 18, 1964 contract and ending with the December 21, 1964 contract; and also the performance by the defendant under the December 21, 1964 contract.

Both contracts [1] involve an anti-skid device for automobiles invented by the president of the plaintiff, Frank Perrino (hereinafter "Perrino"); patented by him and the patents assigned first to the plaintiff corporation and thereafter pursuant to the December 21, 1964 contract to the defendant. It should be remembered that anti-skid devices for automobiles were not generally marketed prior to 1964, and that there is no attack whatsoever on the patents which underlie this suit.

This action started as one to set aside the December 21, 1964 contract and to enforce certain provisions of the June 18, 1964, contract. That complaint was dismissed by Judge Frederick vanPelt Bryan of this Court except that Judge Bryan found that a cause of action lay in the "Wherefore" clause of the complaint that the defendant may have not used its "best efforts to market and manufacture" the invention assigned to it under the December 21, 1964 contract. Civil No. 66–665 (S.D.N.Y., filed March 29, 1968), aff'd 410 F.2d 572 (2d Cir. 1969).

Thereafter, Judge MacMahon of this Court, in denying another motion for summary judgment, further delineated the issue of "best efforts" as follows:

". . . we think that 'best efforts' here means that Singer was required to continue collaborating with Perma for a reasonable length of time in a good faith effort to solve the problems then preventing marketing of the product."

\*　\*　\*　\*　\*　\*

"For example: (1) Did Singer use its best efforts for a reasonable time . . . to perfect the product under all the circumstances? (2) In view of the fact that the device was not 'fail-safe,' was Singer justified in abandoning the contract either because it was impossible to make the device 'fail-safe' or because it could not be made 'fail-safe' without unreasonable, unwarranted or impractical efforts and expenditures of time and money out of all proportion to engineering and economic realities?" 308 F.Supp. 743, 748–49 (S.D.N.Y. 1970)

While I defined the issues at the start of trial in a somewhat similar manner to that of Judge MacMahon, I permitted extraordinary latitude to the defense to prove all that it could and to make any arguments it wished as to its defenses and its counterclaim. Since the case was tried without a jury I permitted

---

[1]. A third contract was entered into by the parties which is referred to herein as the "Technical Services Contract". No breach has ever been claimed of this contract although it will be referred to from time to time throughout this opinion.

certain evidence to be received which is of questionable probative value. All of this was done with a view that this trial would mark an end to this litigation.

In summary, I find for the plaintiff on the claim that was tried. I also find that the counterclaim advanced by defendant was totally sham as a matter of fact.

This opinion is to be considered findings and conclusions as required by Rule 52 of the Federal Rules of Civil Procedure.

## I.
## BACKGROUND OF THE PARTIES

Frank Perrino, although a person without formal engineering training, has been a "tinkerer" all his adult life. After being discharged from the Air Force, where he received training as a airplane mechanic, he returned to his native New England where he invented an accelerator brake and filed for a patent in 1959. An anti-skid control was part of this accelerator brake patent application. In 1962, a separate patent application was filed for the anti-skid invention. Thereafter, the anti-skid was separated into five patent applications representing different aspects of the device. These applications matured into five separate patents between 1966 and 1969 after the assignment of them to the defendant.

Perrino founded the plaintiff corporation, Perma Research & Development Company (hereinafter "Perma") under Delaware law and has been its president at all relevant times. Perma has its principal place of business in North Attleboro, Mass.

The Singer Company (hereinafter "Singer") is a New Jersey corporation with its headquarters in Rockefeller Center, New York, N. Y. While originally started as a manufacturer of sewing machines, it has become a widely diversified manufacturing concern. The 1965 annual report for the Singer Corporation shows sales of $980 million from manufacturing and sale of heating and air conditioning equipment, technical products, business machines and computers, and a variety of other devices, of course including sewing machines. During 1965 alone, Singer spent $18 million on its various research and development activities.

Both parties acknowledge that this Court has jurisdiction over this action based on diversity of citizenship. 28 U. S.C. § 1332.

## II.
## BACKGROUND TO THE NEGOTIATIONS LEADING TO THE JUNE 18, 1964 CONTRACT

After the invention of the accelerator brake and the recognition that the anti-skid control could be separated from it, Perrino tried to interest various people in the automotive industry in the devices. Of particular note is the fact that he took the anti-skid device to the Bendix Corporation in 1960, where it was considered by Stanley I. MacDuff, who tested it once by driving it home and who recommended that Bendix decline any interest in the device. (As we will see later, this was the same Stanley I. MacDuff whom the defendant Singer employed as an expert when it became apparent that this case would go to trial and who was permitted to give "expert" testimony at trial). Perrino, on behalf of Perma, was apparently unable to interest anyone in the anti-skid device but continued working on it at North Attleboro, Mass.

Perma also arranged to have tests made of its anti-skid device by certain automotive companies and by the Motor Vehicle Research of New Hampshire (hereinafter "M.V.R.N.H."), apparently a private organization owned by one Andrew White. M.V.R.N.H. agreed to do the testing for a portion of the capital stock of Perma and White became a member of the Board of Directors of Perma. M.V.R.N.H., thereafter, issued a glowing report on the Perma anti-skid device. Much of the report, however, only hints at conclusions and little firm

test data is contained therein. Armed with this report and a promotional film, Perrino, on behalf of Perma, set out again to sell some manufacturer on the anti-skid control device. Apparently this effort was again unsuccessful although Perma had put together a number of hand-tooled, hand-finished prototypes.

Apparently in late 1963 or early 1964, Perma had arranged for a distribution agreement of the anti-skid device with a small number of automotive equipment distributors and new car dealers and had entered into a contract for the manufacture of the device by the Worcester Stamped Metal Company of Worcester, Mass., which in turn had sub-contracted with others for the manufacture and assembly of some of the components of the device.

Perma, through Perrino, continued to try to interest safety officials, highway patrols, insurance companies and others in the device. Apparently some officials of the Singer Company (Canada) Ltd. saw the promotional film, the M.V.R.N. H. bulletin and advised the management of the Elizabeth, N. J., Singer plant of the device.

During the period of the early 1960s, imports of cheaper sewing machines (particularly Japanese made models) had cut into Singer's share of the sewing machine market. Singer had already started to diversify its product line and yet much of Singer's Elizabeth plant, which had been engaged principally in the manufacture of sewing machines, stood idle.

## III.

### THE NEGOTIATIONS FOR THE JUNE 18, 1964 CONTRACT

In February 1964, representatives of Singer's Elizabeth, N. J., plant travelled to North Attleboro, Mass., to meet with Perrino and other representatives of Perma. Perrino apparently told the Singer people at that time that the Perma anti-skid device was "fail-safe" (or in plaintiff's version, "had fail-safe fea-tures") and "that in case of a failure, that the car would revert back to its normal braking". The Singer representatives were also assured that in the event of some internal failure "the unit in effect deactivated and reverted back to the original brake system on the car". The Singer people were also shown the Perma promotional film which stated "The Perma anti-skid control . . . includes a fail-safe feature which will automatically revert to the standard braking system in case of failure." These statements or ones similar to them allegedly were reiterated by Perma officials in the months leading to the June contract.

Similarly, Singer was told that the device was "perfected" and that Perma had "had testing done by an independent laboratory." In connection with this latter assertion Perma supplied the Singer officials with copies of the M.V. R.N.H. report.

It is on the basis of these asserted "false misrepresentations" that the defendant asserts its counterclaim and its affirmative defense since the device was neither perfected nor fail-safe.

At the initial meeting in North Attleboro, the Singer personnel present were Messrs. Kloby, Morris and Sprague. Kloby was to be the man in charge of the Perma anti-skid program for Singer. He admitted that he had no background in engineering. Morris at the time was the assistant general manager of the Elizabeth facility and after June 1964, became the general manager of the facility. Sprague was the chief engineer of the Elizabeth plant. Each was a witness to a demonstration of the Perma product at this February meeting. First a Perma employee drove a car equipped with the anti-skid device on a test tract behind the Perma offices. Then the representatives of Singer were given a demonstration ride in a car equipped with a Perma anti-skid device over country roads. A number of stops were made under panic conditions. Some of these were made while the car was driven with two wheels on dry road and the

other two on the wet, snow-covered shoulder.

Singer had immediately after the initial meeting in February been given a set of plans and specifications, along with three anti-skid controls and a cutaway of the device. These were necessary for Singer to work out the cost to build the anti-skid control. In return, the Singer officials left with Perma a brochure which was boastful about the engineering and quality control, expertise of Singer.

While it is clear that Singer sought out Perma to beef up production in its Elizabeth, N. J., plant, it is similarly clear that Perma was anxious to have Singer take over the manufacturing of its anti-skid device since the Worcester Stamped Metal plant was on strike and Perma was dissatisfied with the quality control of the units being delivered by Worcester.

Prior to signing the June 18, 1964 contract, Perrino and his cohorts from Perma visited the Elizabeth plant and displayed to the top Singer officials the entire device with all of its components spread out on conference tables. The promotional film was shown and the M.V.R.N.H. report was distributed. Among the many Singer representatives present at the presentation were the top officials of the Elizabeth plant along with the top engineers assigned to that facility. This fact becomes important as we will see because one of the "experts" who testified on behalf of the defendant at trial indicated that any engineer worth his salt would, on inspection, have rejected the Perma device as totally unmarketable. I must assume that this was a damning of the Singer engineering capabilities, which is a strange defense and one which I will not rule on.

## IV.

### THE JUNE 18, 1964 CONTRACT AND THE EXPERIENCE OF THE PARTIES THEREUNDER

On June 18, 1964, the parties entered into a Patent Licensing Agreement by which Perma granted Singer the exclusive right to manufacture the device in the United States. In order to oust the Worcester Stamped Metal Company, Singer agreed to buy the inventory then being held by Worcester. This cost over a million dollars.

It is undisputed that, after the Elizabeth plant acquired the inventory and started production, many defects were found in the mass-produced device. During this period from mid June to December 1964, officials from Perma visited the Elizabeth plant quite often and the parties redesigned a number of the components of the device, including many of the so-called "fail-safe features".

Rather than attempt to describe the entire device, I am appending hereto a copy of one of the patents which most fully discloses its configuration and operation. (Appendix A) From this the reader should note that anti-skid control consists of a flexible cable attached to the speedometer cable, which drives a set of weights in the sensor; the weights spin in a centrifugal fashion which, when suddenly slowed or stopped, collapse in such a fashion on one side to force a cam gear to actuate a micro switch which permits electricity to pull back a solenoid on the other side of the sensor; which in turn permits a rotary valve to introduce vacuum into the system. This vacuum draws back a diaphragm in the "Perma-Vac", which in turn pulls back a plunger which takes hydraulic fluid from the brake system and thus relieves pressure on the brakes. A pressure switch is included in the device at this point so that when pressure is reduced the electricity flowing to the solenoid is cut off and the vacuum stopped at the diaphragm, thus permitting full brake pressure to be exerted. In this manner the brakes are "pumped" in a "panic stop", thus lessening the chance for a locked wheel skid.

During the period of June through December 1964, the pressure switch was redesigned with Singer's chief engineer on the project so deeply involved in the redesign that he made some of the parts

by himself in the tool room at the Elizabeth plant.

Similarly, it was discovered that the cam gear which activated the micro switch was not operating properly. Singer's chief engineer on the project concluded that this feature was "marginal" and suggested that it be redesigned. Instead, a temporary solution was worked out whereby the cam gear was polished.

Other difficulties with the device were recognized by the Singer staff. They noted that the sensing unit could become packed with contaminants in ordinary usage; that the rotary valve could and did "bind" on occasion; and that the Perma-Vac spring should be strengthened.

On September 17, 1964, Singer's chief project engineer confided his fears about the reliability of the anti-skid control to management in a memorandum which reads in part:

> "I am deeply concerned about the reliability of this device in general. My cause for alarm stems from the fact that the performance testing does not detect some defects which could cause malfunction of the unit during operation on a car . . . I feel it would be advisable to get a detailed specification from Perma listing all the possible causes for failure so we may incorporate tests to detect deficiencies before sending units out of the plant. I strongly recommend that the legal aspects of responsibilities be thoroughly investigated so that we may be fully covered for what is sold before the confidence level is determined to be satisfactory."

Whether, in fact, Singer asked Perma for such "detailed specification" is unclear but it is clear that none was forthcoming.

During the period from June through December 1964, Singer conducted a number of tests on the anti-skid controls that it was producing. These were done on test stands acquired from Perma. A device was also installed on a Singer vehicle. These tests, however, were not exhaustive, but that was a choice by Singer management and in no way now bolsters its counterclaim and affirmative defense.

Because of the problems recognized by Singer, few of the anti-skid controls were marketed prior to the December contract, thus leaving Perma financially distressed. Both parties recognized the need for further engineering on the device and this situation led to the negotiations for the December 21, 1964 contract.

## V.

## NEGOTIATIONS FOR DECEMBER 21, 1964 CONTRACT BETWEEN THE PARTIES

The exact genesis of the negotiations leading to the December 21, 1964 contract between the parties is unclear but it is clear that Perma entered the negotiations with a negative balance sheet and the recognition that it could not perfect the anti-skid device for market on its own. Singer offered to Perma its engineering skills and purported expertise.

But, before entering the December 21, 1964 contract, Singer, although it had done its own marketing surveys and had seen Perma's estimates, commissioned William E. Hill & Co., Inc. to do another market survey. The report of the Hill organization delivered to Singer management at least a week prior to the December 21, 1964 contract with Perma totally demolishes the counterclaim and affirmative defense advanced by Singer. It so dramatically proves that the management of Singer could not have relied on any alleged false representation by Perma that it is set forth in full in Appendix B hereto.[2]

2. It is astounding to me that in the hundreds of pages of proposed findings and conclusions and briefs submitted by the representatives of Singer there is not one mention of the Hill report, except to serve as a crutch on the question of damages.

Among the "Principal findings and conclusions" of the report are the following:

"The Perma antiskid control falls short of meeting requirements of automotive engineers and does not provide the improvement possible in theory. The consensus of many engineering tests that have been run on the unit indicate that the Perma control, as compared to a panic or locked wheel stop, gives improved steering control but requires a greater stopping distance to come to a complete stop. The automotive brake and safety engineers who have reviewed its performance do not agree on the value of the Perma anti-skid control . . ."

\*　\*　\*　\*　\*　\*

"The General Motors Research Center, the Ford Advanced Design Group and the Chrysler Brake Laboratory are against the use of the control."

\*　\*　\*　\*　\*　\*

"Based on evaluation by major automobile manufacturers the Perma anti-skid control does not meet established requirements."

In an appendix to the Hill report is a summary of the results of tests which representatives of Singer, at trial, claimed were concealed from Singer by Perma prior to the December 21, 1964 contract. Apparently this claim has now been abandoned.

■ Singer, however, still presses its claim that Perma falsely misrepresented that the device was "fail-safe" and that it was fully "perfected" and "tested" and that Singer relied upon these representations in entering the December 12, 1964 contract. I hold as a matter of fact that there was no such reliance. Without reliance any misrepresentation is not cognizable at law either as a counterclaim or as an affirmative defense. In the situation presented only an ostrich could make the claim defendant does. It is clear to me that both the counterclaim and the affirmative defense raised by Singer are sham.

## VI.

## THE DECEMBER 21, 1964 CONTRACT BETWEEN THE PARTIES

On December 21, 1964, the parties entered into a contract whereby Perma assigned its patent applications to Singer. It is clear that the parties knew at that time that the anti-skid device was not fully perfected and that Singer would have to do work to make the device a marketable one. In consideration for the assignment of these rights Singer paid off all the outstanding debts of Perma and agreed to pay royalties on each Perma anti-skid control marketed. No minimum royalty was agreed to in the contract, a somewhat unusual arrangement.

It is true that both parties to the contract were looking for the anti-skid control to be quickly marketed, for both had expectations of deriving profits from it, but these expectations do not give credence to Singer's argument that the contract did not call for any engineering work by Singer on the device. That promised engineering work is the total foundation upon which the December 21, 1964 contract is based. It is true that the expected engineering work is not spelled out in the contract. And it is for that reason that we must consider whether Singer made its best efforts in collaboration with Perma for a reasonable length of time in a good faith effort to solve the problems then preventing the marketing of the product.

In this connection it must be noted that the December 21, 1964 assignment of Perma's patent rights to Singer was accompanied by a Technical Services Contract of the same date. This Technical Services Contract required Perma to collaborate with Singer in any engineering efforts which Singer required the inventor to do to make the device marketable. The very existence of the Technical Services Contract gives the lie to Singer's contention that no further engineering work was contemplated by the parties as of December 21, 1964, the date

they entered the patent assignment contract.

## VII.

## SINGER'S PERFORMANCE UNDER THE CONTRACT

To properly evaluate Singer's performance under the patent assignment contract it is necessary to look first at Singer's capability. In 1965, Singer had 15 research and development laboratories and employed more than 2,200 scientists, engineers and technicians. Singer's net earnings in 1965 were $44 million.

Singer chose to leave in charge of the Perma project after December 12, 1964, those who had worked on production under the prior June contract: Robert Kloby and Albert Romel. Kloby was given the title Manager, Perma Anti-Skid Program. His education and experience were concentrated in marketing, market evaluations and sales projections. He had no engineering background whatsoever. Albert Romel was an engineer graduated from the Newark College of Engineering in June 1964, which he attended while working for Singer at the Elizabeth plant. Virtually for his entire adult life Romel had been employed at the Elizabeth plant where he had been engaged in the manufacture of sewing machines. Prior to working on the Perma device, he had no employment experience in automotive or brake industries. Until he started to work on the Perma device he had never worked on brake systems.

Both Kloby and Romel testified at trial. Romel, the engineer in charge assigned to the project by Singer, took 22 minutes on the witness stand to compute the relative proportion of one circle to another after being given pencil and paper and the relevant equations which require merely squaring one number. At the point this exercise was called for, Romel had been on the stand for a number of days. He did not appear nervous. Yet his computations were totally wrong. The history of the project shows that Romel was not an innovator but merely followed his instructions. He testified that although he had worked on the Perma device starting in June 1964, and had been exposed to it in February 1964, he had not analyzed the invention prior to the contract of December 21, 1964.

Romel's staff consisted of three graduate engineers, one engineering student and various others who were given grandiose titles which seem to have been invented solely for this litigation. One engineer from Singer's Denville research laboratory was also assigned to the project for a period of about one month.

Kloby and Romel were under orders to keep expenses down. The manager of the Elizabeth plant received a memorandum from corporate headquarters dated January 7, 1965, which stated in part:

"It is of the utmost importance that we spend no additional moneys and generate cash flow as quickly as possible . . ."

To this the following response was made:

"Every additional expenditure for the Perma product line is being scrutinized thoroughly by this office. No additional moneys are being spent unless absolutely necessary in order to control our total investment."

One Singer official estimated that during the year 1965, the project cost $190,000 including salaries of all assigned to the project, allocation of normal expenses to run the Elizabeth plant, etc. This figure appears inflated although Singer at trial tried to prove an even more bloated figure. In this attempt the witnesses for the defendant contradicted themselves and each other in many respects. For example, Kloby testified that in September 1965, he was removed from the Perma project and returned to "Forward Planning" at the Elizabeth plant; yet his salary for the entire year is attributed to the Perma project.

In any event, it is clear that Singer gave inadequate funding to the entire program and staffed it with inept and

inexperienced people who were unable to even understand the problems, much less cope with them. At one point Singer advertised for an automotive engineer who specialized in brake systems. He was not hired.

Shortly after undertaking the December 21, 1964 contract, Singer attempted to set up "liaison" with automotive and brake manufacturers. This consisted of one trip for Kloby and Romel to the Detroit area early in 1965, and conversations with various people there. It is astounding that Kelsey-Hayes, a well-known brake manufacturer, at that time offered to analyze and do tests on the device, (apparently without cost to Singer) but that the offer was rejected out of hand, at least until Singer recognized that this litigation was impending.

In March 1965, Singer received from E. I. duPont deNemours & Co. (hereinafter "duPont") an analysis of a 1963 vintage Perma device. This analysis set forth a number of potential failure modes in the device which could cause an unsafe condition and loss of brakes. No independent analysis of the device was made at this time by Singer. Romel thereafter concentrated the efforts of his staff in attempting to resolve the problems posed by the duPont report and those obviously required by the changes made in braking systems introduced by the automotive manufacturers.

Some of the 1965 model automobiles had for the first time self-adjusting brakes and disc brakes. For the Perma device to work with these new features required greater fluid displacement and higher hydraulic pressure. Pursuant to the Technical Services Contract, Perma proposed to change the device by changing the piston bore and the spring in the Perma-Vac. This, however, would have rendered worthless much of Singer's inventory and in February 1965, Perrino, at Romel's direction, designed a transfer valve whereby vacuum would be introduced to the front of the Perma-Vac diaphragm to assist in pumping the brakes. The device thus became totally vacuum

dependent with this change and introduced more failure modes into its operation. If there was a loss of vacuum for any reason (e. g. an engine stall), the brakes might not be fully reapplied.

In order to meet the demands of the new braking systems Singer also experimented with a "restrictor valve" which was devised by Romel and those working for him. The "restrictor valve" is a simple device which permits hydraulic fluid to run more freely in one direction than in the other. It appears that there are serious questions as to the efficacy of this addition and these questions are of real substance.

It is clear to me that Romel and his staff did not have a full understanding of the dynamics of the device or of an automobile to which it was to be attached.

Romel tested various models of the Perma Anti-Skid throughout the period from June 1964 through December 1965, on test stands basically supplied by Perma at the Elizabeth Singer plant. He also arranged for road tests at the Linden, N. J., airport.

It is of some interest that the officials of Singer spurned Perrino and the other officials of Perma during most of the period after the December 21, 1964 contract. While the Perma people were at the Elizabeth plant, conferring with Singer at least two or three times a week under the June 18, 1964 contract, this liaison almost totally ceased after Singer entered the December 21, 1964 contract even though under the Technical Services Contract Perrino and Perma remained obligated (at no extra cost) to confer with Singer about the development of the anti-skid unit. When the Technical Services contract expired it was not renewed but thereafter Perrino continued to make technical suggestions to Singer.

In June 1965, Singer through Romel and his staff were conducting road tests on the Perma device. These tests were conducted on a completed but unused section of Interstate Highway 295.

## VIII.

### SINGER'S DECISION TO ABANDON THE CONTRACT

At about this time, corporate politics inside Singer called for a shakeup in management. Apparently there had also been some grumbling from corporate headquarters about the non-profitability of the Perma project. Finally, Alfred DiScipio was named as corporate vice-president in charge of Consumer Products. Among the many product lines under Mr. DiScipio's direction was the Perma Anti-Skid Device program.

DiScipio, with some of his staff, visited the Elizabeth plant to review production of all product lines manufactured there. In connection with the review the group from corporate headquarters went to view the road tests of the Perma device being conducted at the Interstate Highway.

A car was driven down the highway and subjected to a "panic" stop, first with the Perma device inactivated and then allegedly twice with the anti-skid control in operation. On all three runs the car swerved and skidded dangerously out of control.

DiScipio and his group immediately got into their own vehicles and drove away, surprisingly without even checking to see if the anti-skid had been operative or ascertaining what caused its failure.

At a meeting following the abortive demonstration, DiScipio announced that the anti-skid control was not fail-safe. He told the group that Singer would not market a product which "could leave the purchaser . . . less safe than if he hadn't elected to purchase it . . . " It must have been as clear to DiScipio's subordinates as it was to me on trial that DiScipio was enunciating an impossible standard yet apparently none of his subordinates dared to question their boss. It is my belief that DiScipio had determined to get rid of the Project on the very day he first saw it demonstrated and that he communicated this decision to his subordinates although not in so many words.

In any event, a few days later DiScipio set up a "Task Force" to study the Perma project which was chaired by Burton Person, DiScipio's assistant, and, significantly, included an attorney from the staff of house counsel. Person thereafter circulated a memorandum setting out the guidelines for the work of the Task Force. The memorandum questions whether manufacturing and marketing an anti-skid device for automobiles was the type of business which was appropriate for Singer and outlined certain areas for study, including Singer's legal exposure and possible costs if the project was terminated. Technical evaluation of the device was first sought from Kloby and Romel. Romel's report dated July 22, 1965, declares "due to cost and limited personnel available, it was decided to restrict extensive experimentation to short range projects." This admission in and of itself gives a fair insight into the real efforts used by Singer under the December contract with Perma.

Within days after getting the Romel report, Person, on August 10, 1965, circulated the first report of the Task Force. Basically, it recommended the withdrawal of the device from the market; the retrieval of units already sold and in use; the termination of distributorship contracts; and an approach to Perma to "provide flexibility for Singer in regard to divestiture". Significantly, the report also directed that all letters and strategy were to be reviewed by outside counsel to Singer. At the time of the preparation and circulation of this first report, no outside engineering evaluation of the device was considered by the Task Force although it is clear that the members of the group had at the outset contemplated getting such an evaluation from the Cornell Aeronautical Laboratories and at least from Singer's own Denville Research and Development Laboratories.

The August 10, 1965 First Report of the Task Force sounded the death knell of any real effort by Singer to perfect and market the Perma anti-skid device. Much of what occurred thereafter was merely a charade staged in contemplation of the possibility of litigation.

On August 30, 1965, Person and Singer's attorney Boriss went to North Attleboro to meet with Perrino and other representatives of Perma. Person announced that the Perma program had been stopped since the device was not "fail-safe", which he defined as being so designed and made "so that no matter what, it must revert to the conventional braking system". Person also stated Perma had to solve the problems.

On September 9, 1965, Person wrote a letter to Perrino asserting that Singer had legal claims against Perma. This letter also stated that Singer proposed "to procure the evaluation of a qualified, independent laboratory and have in fact initiated discussion with the Cornell Aeronautical Laboratory". The letter failed to state that Singer had decided against having Cornell do such an evaluation.

In fact, Person had, on September 3, 1965, requested from Singer's own Denville Research and Development Laboratory a report on whether the anti-skid device was fail-safe. The device as submitted to the Denville scientists and engineers contained the transfer valve. The Denville report as finally submitted is dated November 9, 1965. The contents of that report are extremely significant but they will be outlined below.

Meanwhile, Romel and his staff at the Elizabeth Singer plant kept searching for a quick solution to the problems of the anti-skid device. I can characterize these efforts only as being abysmally inept. The proposals generally ignored fundamental engineering concepts. For example, to minimize hysteresis (sticking) in the rotary valve, Romel experimented with a larger rotary valve, thus increasing the area where friction would

occur with concomitant aggravation of the fundamental sticking problem.

At the same time, Perrino had also attacked the "fail-safe" problem and by early November had come up with a set of proposals including a bleeder hole to the back of the Perma-Vac which would restore brakes if vacuum was present longer than a pre-determined time; a variable displacement piston to increase output pressure; and a vacuum time delay device which would turn off the device after a pre-determined time. Perrino called the last proposal a fail-safe for the fail-safe.

On November 4, 1965, Perrino called Person and gave him a brief description of his proposals and agreed to send him a schematic of the devices. He also called Romel and described the proposals to him and likewise agreed to send Romel a schematic.

Without seeing the drawings, Romel, in a conversation with Person, stated his opinion that the proposals advanced by Perrino would not work.

Romel did not get the drawings until November 10, 1965, although Person, who could not judge the devices on his own, did receive the schematics on November 9, 1965. On November 9, 1965, Person also received the report of the engineering analysis from Singer's Denville Research and Development Laboratory. This report described the work by Singer at Elizabeth as "modest", and concluded that the device was not fail-safe because of its vacuum dependence caused by the transfer valve (induced by Romel to save inventory). The report further stated that a redesign program estimated to cost $30,000 could overcome this problem. The defendant did nothing to implement this proposed redesign program.

On the same day as Person received the Denville report and Perrino's proposal, he submitted a Task Force report to DiScipio which formally recommended the divestiture of the Perma program. That night DiScipio and Person met and

DiScipio orally agreed to the divestiture. Two days later, DiScipio gave formal approval to the Task Force Report but noted that a reserve of $2,000,000 should be set up instead of the $1,500,000 recommended in the report.

Person then set up a meeting with Perrino on November 22, 1965, in Providence, R. I. There he handed Perrino a letter dated the same day which basically rejected Perrino's ideas to make the anti-skid device more "fail-safe". Person, when questioned about Singer's real purpose, told Perrino, "Very bluntly, Frank, we do not want to be in the brake business—our people at Elizabethport should not have gotten into the brake business." Peron tried to get Perrino to change the December 21, 1964 contract but Perrino refused and threatened to bring this lawsuit.

After the November 22, 1965 meeting, this litigation loomed and nothing much of what was done by Singer is of much import. Of course, Singer tried to cut its losses by attempting to sell the device. For some reason, perhaps as an attempt to cloak what Singer recognized was a breach of its contractual obligations, Romel continued working on the Perma project with his curtailed staff. He spent most of his time until January 26, 1966, prototyping the device for new model cars, i. e., measuring the lengths of vacuum hose, speedometer cable, etc., for the changed models.

On January 26, 1966, Singer finally abandoned all pretense and abandoned any effort to perfect the device.

## IX.

### THE COUNTERCLAIM AND AFFIRMATIVE DEFENSE OF FRAUDULENT MISREPRESENTATION

Although the Post Trial Brief submitted by the defendant lacks definition of exactly what it relies on in support of its counterclaim and affirmative defense, it is clear that the claims may be broken into the following three categories: (1) perfection and testing; (2) performance; and (3) fail-safety.

Singer claims that Perma and its representatives misrepresented each of these areas in inducing the defendant to enter the December 21, 1964 contract.

■ Before turning to the specific allegations, it may be well to set out the elements required to prove fraudulent misrepresentation. Basically they are: (1) that material representations were made by one party to a contract; (2) which representations were false; (3) and were made with the requisite degree of scienter (or knowledge of their falsity); and (4) which were relied upon at the time of entry into the contract by the other party thereto. *Daly v. Wise*, 132 N.Y. 306, 30 N.E. 837 (1892); *Becker v. Colonial Life Insurance Company*, 153 App.Div. 382, 138 N.Y.S. 491 (2d Dept.1912).

### (1) *Perfection and Testing*

It cannot be disputed that the promotional movie shown to Singer executives at the Perma plant in February 1964 and then again at the Singer Elizabeth facility in April 1964 represented that the Perma Anti-Skid device was a "perfected, patented device". Such representations were apparently repeated by Perrino to Romel during the period from June 1964 to December 21, 1964, the date of the contract.

Perrino, on the other hand, claims that he meant that the device was "workable, useable and marketable".

■ It is clear to me that the statement in the movie was mere "puffing" and was accepted as such by the executives of Singer. Singer, by its experience manufacturing and testing the device under the June 18, 1964 contract, certainly cannot claim reliance on this statement nor on the representations by Perrino. I have already detailed that changes were made in the device by Romel prior to the December 21, 1964 contract.

■ I find that it is totally incredible to believe that Singer relied on these statements when it entered the December 21 contract. If it had, then certain-

ly Singer would never have entered the Technical Services Contract with Perma which looked to perfection of the device.

■ As to the contention that Singer considered the anti-skid device as "fully tested" and relied on the plaintiff's alleged statements to that effect in entering the December contract, we need look to only two Singer documents to give the lie to this. The first is Romel's memorandum of September 17, 1964 (set out above at page 888), which calls for further testing. The second is the Hill Report which recites in Exhibit 1 thereto the "Results of Engineering Tests of the Perma Anti-Skid Control" where 6 out of 7 tests show that "Reliability of Unit" was not tested and where 5 out of 7 show that the device was not totally acceptable.

The lack of any scintilla of proof of reliance on the part of Singer on any of the alleged misrepresentations must doom this allegation.

### (2) Performance of the Anti-Skid Device

It is interesting to note that Singer abandoned many of its claims of misrepresentation but has half-heartedly consigned to footnotes in its Post Trial Brief (pp. 6 and 17) certain allegations of fraudulent misrepresentation, the chief among which are that the device provided "shorter stopping distances" and "modulated in accordance with a graph on page 4 of Report No. 13 of Motor Vehicle Research of New Hampshire".

■ Again, even if these statements were made by plaintiff (which I doubt), there is positive evidence that Singer could not have relied on them. Once again, this evidence is found in the Hill Report where Exhibit 1 shows that longer stopping distances occurred with the Perma Anti-Skid Device and that the device "cycled through this lock-roll-lock-roll condition about *four* times a second . . ." and thus could not be said to modulate.

In the face of the Hill Report, which was supplied to Singer management at least one week prior to entering the December 21 contract, how the defendant can claim reliance on these alleged misrepresentations is beyond my ken.

The other allegations about misrepresentation of performance are so without merit as to preclude any discussion of them in this opinion.

### (3) Fail-safety

Singer has defined "fail-safety" as follows:

> "We do not regard a device as failsafe unless failure of the device regardless of cause or probable frequency of a particular type of failure, does not impair the utility of the underlying system to which it is connected."

Its own expert has totally rebuffed Singer's definition of "failsafe", stating that such a standard is almost impossible of attainment. I admit that I can think of only one mechanical device which might meet this test: a wedge— the simplest tool known to man. It is important to note that, according to Singer's own expert, there has never been an anti-skid system marketed in the United States that satisfied the definition of failsafe advanced by Singer.

■ It is uncontroverted that Perma represented to Singer that the "anti-skid" device in question had "fail-safe features" which, if the device malfunctioned, would return a car equipped with the device to its underlying braking system. But to torture this into the absolute "failsafe" advocated by Singer is to warp the words used by Perma representatives and to wrench a new meaning from them heretofore unknown to semantics. I find that there was no misrepresentation by Perma in this respect.

■ And even if there was a misrepresentation, there was no reliance on it by Singer. During the period from June through December 1974, the personnel at the Elizabeth Singer plant encountered any number of failure modes in the Perma device. They knew on De-

cember 21, 1974 that the anti-skid control could not meet the standard now advanced by Singer.

Indeed, it appears clear to me that these issues were really a smoke screen to needlessly delay the resolution of this litigation and to harass the plaintiff and this Court. Thus, I find the counterclaim and affirmative defense to be totally sham as a matter of fact.

## X.

### THE DECEMBER 21, 1964 AGREEMENT WAS A "BEST EFFORTS" CONTRACT WHICH SINGER BREACHED

Singer contends that the contract in question was merely an assignment of patents, which contract would not require any effort on the part of the assignee to perfect the device, citing *Eclipse Bicycle Co. v. Farrow*, 199 U.S. 581, 26 S.Ct. 150, 50 L.Ed. 317 (1905) and other such cases.

In so doing, the defendant completely ignores the facts. This Court will not follow Singer down such a totally ignominious path.

■ The contract before this Court is not merely an assignment of patents. Rather, clearly implied in the contract is the intention that Singer would use its best efforts to perfect and market the device.

Though the words of the contract do not spell out this obligation, the circumstances leading to the signing of the contract mandate such an implied obligation. See *Wood v. Lucy, Lady Duff Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917); *Eastern Electric, Inc. v. Seeburg Corp.*, 427 F.2d 23, 26–27 (2d Cir. 1970); 3A Corbin, *Contracts* § 562 (1960). It is true that Perrino testified that he "did not discuss anything about perfecting the device" at the time he entered the contract. But it is clear that the perfection and marketing of the device was the heart of the December 21, 1964 contract.

To reiterate what is said in Section V of this opinion: Perma at the time it entered the contract had a negative balance sheet with a number of large outstanding debts, since few of the anti-skid devices were sold between June and December 1964. The reason that there were so few sales was that imperfections had been discovered in the device. Singer and Perma had been working to resolve these imperfections. Singer offered its purported engineering expertise to perfect the device in return for a contract which did not even guarantee a minimum patent royalty.

Singer knew that the device was still to be perfected for why else would it have entered into the Technical Services Contract with Perma? The Singer personnel discovered all of the difficulties which prevented any meaningful sales of the device under the June contract. They knew of the problems with the anti-skid and necessarily knew that it had to be perfected.

Since the December 21, 1964 contract which Singer foisted on Perma does not disclose the efforts Singer was to expend on perfecting the device, it must be assumed that it was a "best efforts" contract, i. e., as Judge MacMahon indicated, that: "Singer use its best efforts for a reasonable time . . . to perfect the product under all the circumstances." 308 F.Supp. at 749.

■ Did Singer use its "best efforts" to perfect the device? Clearly, as I set out above, its efforts were at best inept and certainly not "best efforts". There is no doubt Singer could have accepted Kelsey-Hayes' offer to analyze and test the device. It did not do so. There is no doubt that Singer could have turned the program over to its Research and Development Laboratories. It did not do so. There is no doubt that it could have hired an engineer with experience in the automotive or brake field. It did not do so.

There are any number of reasonable things which Singer could have done to

perfect the device without unreasonable cost or effort. It did not do so.

Did Singer use its best efforts to perfect the Perma Anti-Skid device? It did not do so.

## XI.

## SINGER'S CLAIM THAT THE PERMA ANTI-SKID DEVICE WAS WORTHLESS AND COULD NOT BE PERFECTED AND MARKETED

Singer clearly set forth in the Pre-Trial Order that it considered the Perma Anti-Skid was worthless since it could not be perfected. As part of its main case to rebut this contention, Perma offered the testimony of Daniel Goor and Andre L. DeVilliers.

Both Mr. Goor and Mr. DeVilliers were deeply involved in the development and perfection of the Kelsey-Hayes anti-skid device. Goor, although a consultant, was in charge of the project for a considerable period of time. DeVilliers was an engineer who ran a number of computer simulations on the Kelsey-Hayes device to assist in its perfection to the point that it became marketable.

Since funds were not available to plaintiff to run empirical tests of the Perma Anti-Skid Device, with alterations of the various components, the plaintiff retained DeVilliers to do computer simulations of the device with the possible changes in components. DeVilliers, using the LaGrange equations (which are readily available in standard university textbooks—so much so that the equations were not totally foreign ground to me) produced certain computer simulations. For those unfamiliar with computers, it must be noted that in this context, simply put, a computer is but calculators with a giant "memory" and the simulations the computer produces are but the solution to mathematical equations in a "logical" order.

■ On the basis of the computer simulations produced by DeVilliers, Goor testified that the Perma Anti-Skid Device could be made into a marketable product. Given the state of the art in 1964 and 1965, and even considering the electronic improvements in the anti-skid devices commercially sold today, I find as a fact that the Perma Anti-Skid Device could have been perfected and made marketable with the proper engineering work done.

To counter this evidence, the Singer company produced two main witnesses. Professor Rabins of Polytechnic Institute of New York, testified, on a theoretical plane, that the Perma Anti-Skid Device was worthless. Professor Rabins also testified that he based his opinion on a sample given to him, which sample was not even offered in evidence. Under questioning by me, he admitted that he had never seen the plans and specifications for the device nor any of the models introduced into evidence.

What Professor Rabins saw, measured and based his calculations on is totally unknown to this Court. Consequently, most of his testimony must be disregarded.

■ Stanley I. MacDuff also testified for the defendant Singer as an "expert". An expert witness is produced by a party to give the Court some insight into a technical area. As such, his testimony is most useful if it is impartial. An expert's testimony, like that of any other witness, can and should be tested for credibility by the trier of fact. See generally *Fortunato v. Ford Motor Co.*, 464 F.2d 962 (2d Cir.), *cert. denied*, 409 U.S. 1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972); *Manning v. New York Telephone Co.*, 388 F.2d 910 (2d Cir. 1968); *Scott v. Spanjer Bros., Inc.*, 298 F.2d 928 (2d Cir. 1962).

Stanley I. MacDuff was far from impartial and his advocacy (he is a lawyer) of his client's position was such that any statement emanating from him was immediately suspect. The suspicion of MacDuff's opinion is compounded when we realize that he, while employed by the Bendix Corporation, had totally turned down the Perma device. Not

**898**

only were his views slanted by his present employment by the defendant, but they were also slanted by his prior rejection of the device on behalf of his former employer who now pays his pension.

MacDuff testified on direct that a mechanical (as opposed to an electronic) sensor on anti-skid devices made them worthless. Yet MacDuff admitted that at least one anti-skid [device] had been marketed which had a mechanical sensor. MacDuff's judgment regarding the perfectibility and marketability of the Perma device becomes even more suspect when viewed in the light of his admission that he personally tried to sell to various car manufacturers a totally mechanical anti-skid device produced by a foreign subsidiary of his former employer.

Viewing all of the evidence, I am convinced that the Perma Anti-Skid control was perfectible and could have been marketed. This leads me then to the question of damages.

## XII.

### PERMA'S DAMAGES

Singer cites case law for the proposition that a patent assignor cannot recover for the assignee's failure to fulfill an implied "best efforts" obligation where the patented device is not commercially useful. In *Kraus v. General Motors Corp.*, 120 F.2d 109 (2d Cir. 1941) commercial useability was actually made a part of the licensing contract. In *Peck v. Shell Oil Co.*, 142 F.2d 141 (9th Cir. 1946), the defendant's inability to develop a marketable product constituted failure of consideration such that the licensing agreement was rendered unenforceable. The Perma device, defendant continues, is not useful by reason of its imperfectability as a matter of engineering principle. Even if the cited cases stood for the broad proposition of law urged by the defendant, the argument would fail since I have found the device to be perfectible.

A plaintiff is entitled to the reasonable damages naturally flowing from the defendant's breach of contract. *For Children, Inc. v. Graphics Int'l, Inc.*, 352 F.Supp. 1280 (S.D.N.Y.1972). The measure of damages to which a plaintiff is entitled as a result of such a breach has also been described as the amount necessary to put the plaintiff in as good a position as he would have been if the defendant had abided by the contract. *Hutchins v. Bethel Methodist Home*, 370 F.Supp. 954 (S.D.N.Y.1974).

Although lost profits in a new venture are not ordinarily recoverable (*Cramer v. Grand Rapids Show Case Co.*, 223 N.Y. 63, 119 N.E. 227 (1918)), they may be awarded where: the loss of prospective profits are the direct and proximate result of the breach; profits were contemplated by the parties when they entered the contract; and there is a rational basis on which to calculate the lost profits. *For Children, Inc. v. Graphics Int'l, Inc.*, 352 F.Supp. 1280, 1284 n. 16 (S.D.N.Y.1972); cf. *Flexitized Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir.), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1964).

In *For Children, Inc. v. Graphics Int'l, Inc.*, *supra*, the plaintiff contracted with the defendant for the manufacture of books with a pop-up feature. In placing its order the plaintiff relied on defendant's expertise as a pop-up printer and designer. A large percentage of the books actually supplied to the plaintiff for marketing were defective and the plaintiff properly rejected them despite the defendant's protestations that a 15 per cent margin of error was necessary. Judge Weinfeld rejected defendant's claims since under the contract the defendant had taken responsibility for the design and engineering of the books without qualifying this responsibility with any provision for a margin of error. Although the plaintiff's venture was a new one, the court found that: the parties had contracted with an eye to plaintiff's marketing the product;

the product was ready to be marketed; and there was a reasonable probability that, considering all the circumstances, 75 per cent of the books would have been successfully marketed.

In the case at hand the defendant assumed a greater responsibility in the new venture. Nevertheless, Singer's claim of imperfectability of the device is analogous to the defense raised in *For Children, Inc.* (that a 15 percent margin of error was insurmountable) and has been similarly rejected. Moreover, had Singer fulfilled its obligations under the December contract, the anti-skid device would have proceeded to market as anticipated.

 The remaining determination then is whether damages here are altogether too speculative to assess, or whether there is some reasonable basis on which damages can be computed. It has been held repeatedly that where the defendant renders the determination of damages difficult, he must bear the risk of uncertainty created by his own conduct. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1929); *Autowest, Inc. v. Peugot, Inc.*, 434 F.2d 556, 565 (2d Cir. 1970); *For Children, Inc. v. Graphics Int'l, Inc.*, 352 F.Supp. 1280, 1284 (S.D. N.Y.1972). Furthermore, the Court in *Story Parchment* defined the prohibition against an award of speculative damages as barring those damages which "are not the certain result of the wrong, not . . . those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." 282 U.S. at 562, 51 S.Ct. at 250. As was said in the *Flexitized* case, *supra,* the evidence need not establish lost profits precisely to the penny as long as the evidence provides a reasonable basis for concluding that lost profits were occasioned by the defendant's breach.

The parties have suggested various alternative figures upon which damages should be computed.

It is conceded by both parties that the market for automobile parts and accessories is divided into the OEM (original equipment manufacturers) and the aftermarket (manufacturers and retailers of accessories for automobiles). The defendant offers numerous proposed findings of fact to demonstrate that the Perma device would not have succeeded in either of these markets. Numerous proposed findings are also offered to demonstrate the relative failure of the major automobile manufacturers to market anti-skid devices as part of the original equipment on their 1969–1974 models.

Not only have such devices been unsuccessful in the OEM, but Singer also argues that the Perma device would not have been selected by the major automobile manufacturer. Singer relies on the testimony of its witness Bechtold that there is a three year development period from the year in which automotive manufacturers accept an accessory until the time they offer it as original equipment. Thus they argue that the Kelsey-Hayes device which Ford offered in 1968 was necessarily in the Ford product development cycle in 1966, when the Perma device was first to have been marketed. Singer argues that the Perma device could not have been placed on Ford cars until 1969. In any case, they contend that the Perma device would have required extensive and expensive modification in order to ready it for use on a 1967 model car. Thus they conclude that the retail price of the Perma device would have been greater than or equal to the price of the allegedly superior device which was selected by Ford.

The essence of this line of argument is that in the unlikely event that the Perma device was selected by the major car manufacturers, it would have enjoyed only limited success.

Plaintiff meets these contentions with the observation that Bechtold, on cross-examination, retreated from his testimony that the three year developmental cycle is invariable. Thus the Perma device might well have been available to

and selected by the major automobile manufacturers prior to the other comparable devices. Moreover, they point out that the unimpressive sales record of those devices that have been offered as original equipment reflects the self-evident observation made in the Hill Report that "sales volume will depend on the amount of promotional efforts."

The defendant also argues that there have been virtually no sales in the aftermarket of the comparable anti-skid devices which have been available for almost five years. Plaintiff concurs in that observation which they view as inuring to their benefit since the Perma device would have encountered no competition in the automobile aftermarket, admittedly the principal market in which the parties planned to sell the device.

Defendant's additional proposed findings that Perma had no marketing experience in the OEM or aftermarket; that Perma had responsibility under the June contract for marketing the device; and that Perma had not validly assessed the probable success of the anti-skid device in either the OEM or aftermarket are equally unavailing to defendant in its attempt to minimize damages. The first two points are irrelevant since it was Singer, not Perma, which had the responsibility of marketing the device under the December 21, 1964 contract, the relevant contract in this action. Nor was Perma obligated to assess the probability of success of the device in the OEM or aftermarket.

Defendant urges a finding that its sales projections were based totally on Perma's marketing forecasts. Under the June contract, Patten, Singer's sales manager at Elizabeth, received marketing forecasts from Perma which, when requested, he would incorporate into internal Singer memoranda. In evaluating the merits of what was to become the December contract, Kloby relied, it is urged, on the same sales projections which Perma had supplied under the June contract. Kloby's failure to evalu-

ate potential sales independently can, however, be interpreted as an endorsement of Perma's sales projections.

In any case, these figures were accorded sufficient weight by the defendant to form a basis upon which Singer decided to take over marketing of the device. Similarly, the Hill Report to Kloby, discussed *supra* at pp. 888–889, 895, cited by the defendant to show the lack of interest in the device among major automobile manufacturers, also noted a large potential for sales of the device in the aftermarket. At the same time that it relies on this report to substantiate the bleak prospects for the device in the OEM, the defendant challenges the foundation for the report, rendered at its own request, in an attempt to diminish the impact of the report's enthusiastic evaluation of the device's sales potential in the aftermarket.

In view of the fact that this report is dated December 14, 1964, only a week before the defendant entered the December 21, 1964 contract in which Singer undertook marketing responsibility for the device, it is a fair conclusion that the aftermarket sales projections were perceived by the defendant as justifying the undertaking despite the limited sales potential in the OEM.

In *Autowest, Inc. v. Peugot, Inc.*, 434 F.2d 556 (2d Cir. 1970), the evidence admitted on damages for the defendant's wrongful termination of an automobile distribution franchise consisted of sales projections prepared by plaintiff's witnesses, both of whom had had years of experience in the industry. The figures were "the product of deliberation by experienced businessmen charting their future course." 434 F.2d at 566. The fact that the projections were prepared by defendant's employees in deciding whether or not to proceed with a course of business was found to increase their reliability since they were not "mere 'interested guess[es]' prepared with an eye on litigation." 434 F.2d at 566.

These same indicia of reliability are present in the figures prepared

by Kloby based upon which Singer entered the December 21, 1964 contract. Kloby, experienced in market evaluation and surveys, compiled a report at Mr. Morris' request evaluating the proposal that Singer take over marketing responsibility for the device. The defendant relied upon this report in deciding to enter the December contract. Clearly these projections, prepared by the defendant's market expert, were not put together with an eye to litigation. The argument that the figures merely parrot the reports of Perma to the Elizabeth staff has been dealt with above. If Singer's experts judged them sufficiently reliable to justify entering a contract without further market analyses, then I have no reason to challenge their accuracy.

For the reasons recited, I find that the so-called Kloby figures, which projected sales for the first five years of the ten year contract, provide the best basis on which to compute damages. According to these figures 150,000 units were to be sold in the first two years that the device was marketed with 200,000 units being sold in each of the next five years. These figures are variously substantiated by: (1) Kloby's report to Morris on the feasibility of taking over marketing of the device, which report Morris forwarded to Mr. Murphy in Singer's New York office, who, in turn, reported to his superior Mr. Hough; (2) Hough's December 11, 1964 memorandum to his superior, Mr. Kircher, recommending favorable action on the marketing proposal; (3) a December 21, 1964 internal Singer memorandum for Mr. Torello to Mr. Marsden; and (4) a January 18, 1965 distribution contract between Singer and Monitor Enterprises, Inc. It is eminently rational to project that the 200,000 units per year level which Singer expected to attain after the first two years would at least have been maintained for the second five years of the ten year contract.

Alternative bases for the computation of damages have been offered by the parties and are rejected. The higher figure of 250,000 units for the first two years, which is suggested by the plaintiff, is derived from (1) March 13, 1964 minutes of a Singer meeting on the feasibility of entering the June contract for manufacture of the device and (2) the June 18, 1964 contract itself. The figures relied on by Singer in entering the manufacturing contract were out of date by the time of the December contract and cannot bind the defendant.

Nor will I base damages on the number of units (approximately 139,000) which Perma had contracted to sell to distributors prior to the December contract. The defendant disputes the reliability of these contracts on the grounds that the plaintiff failed to prove the size, financial position, and market experience of the various distributors. Plaintiff meets this argument with the observation that in 1965 Patten and Kloby undertook negotiations with several of the distributors in order to induce them to relinquish their contract rights so that Monitor Enterprises, Inc. (one of the distributors) could become the exclusive distributor for the device in the United States. In any case, at the time it entered the December contract Singer was aware of these agreements and necessarily considered them as a factor in formulating the sales projections on which I have determined to base the damages.

The defendant's suggested lower figures of 100,000 units for the first two years and none thereafter is equally unpersuasive. The 100,000 figure is derived from the Hill Report * of December 14, 1964 which predated several of the documents listed above which demonstrate that Singer entered the December contract with the higher figures in mind. Similarly, limiting damages to two years ending in the fall of 1968

---

* Apparently the defendant views this document as a mixed blessing which it will endorse when favorable, but will ignore when damaging.

when the Kelsey-Hayes device became available is unacceptable since according to the defendant's own proprosed findings of fact the Kelsey-Hayes device was never promoted in the aftermarket and would, therefore, have posed no threat to the Perma device which was to have been sold predominantly in the after-market.

■ The royalties were to be paid, according to the terms of the December 21, 1964 contract, as follows: (1) as to sales in the aftermarket, none on the first 36,700 units, 10% of the factory invoice price for a period of 5 years, and 5% of the factory invoice price for an additional 5 years; (2) as to sales in the OEM, 5% of the factory invoice price for a period of 10 years from the date of the contract; (3) as to royalties received by Singer on the manufacture and use of the device by licensees in the OEM, 25% of such royalties for a period of 10 years from the date of the contract. Since damages on this last basis would be too speculative, no such licensing contracts having been negotiated, damages will be computed solely on the first two provisions for direct sales of the device.

■ The parties agree that the device was first to have been marketed in 1966, thus damages will be assessed beginning in that year. It is clear from the proof that the projected sales for the first two years were to be made solely in the aftermarket, therefore the 10% royalty is appropriate for that period. As to the remaining years in the first five year portion of the December 1964 contract, it would be equitable to apportion the damages for sales in both the after-market and the OEM. There being no adequate proof on which to make such an apportionment, a compromise royalty of 7½% will be applied to sales for those 2 years.

According to Singer's January 18, 1965 contract with Monitor, the factory invoice price was to be $51. Additional factors which should be taken into account are simple interest (New York CPLR § 5001) as fixed by New York CPLR § 5004 and market expansion as reflected in the increased auto registration for each of the relevant years.

■ The damages will not reflect a factory invoice price adjustment based on inflation. Such an adjustment could only be made after similarly adjusting manufacturing costs upon which there is inadequate proof. Moreover, after all the necessary adjustments were made it is unlikely that the result would be significantly altered.

**Computation of Damages Exclusive of Interest to be Computed by the Parties in the Proposed Judgment**

| Year | Units | | Note |
|---|---|---|---|
| 1965 | — | | |
| 1966 | 50,000<br>—36,700<br><br>13,300<br>×$5.10<br>$67,830 | (units) | (10% of invoice price) |
| 1967 | 102,600<br>×$5.10<br>$523,260 | (units) | (including market growth based on increased registration) |
| 1968 | 210,907<br>×$3.83<br>$807,773.81 | (units) | (7½% of invoice price) |
| 1969 | 218,921<br>×$3.83<br>$838,467.43 | (units) | |
| 1970 | 226,583<br>×$2.55<br>$577,786.65 | (units) | (5% of invoice price) |
| 1971 | 232,248<br>×$2.55<br>$592,232.40 | (units) | |
| 1972 | 243,164<br>×$2.55<br>$620,068.20 | (units) | |
| 1973 | 251,675<br>×$2.55<br>$641,771.25 | (units) | (based on projected market increase derived from the average market increase from 1966–1972) |
| 1974 | 260,484<br>×$2.55<br>$664,234.20 | (units) | (based on projected market increase) |

## CONCLUSION

Judgment will enter for the plaintiff in accordance with this opinion along with interest to be calculated at the legal rate on a monthly basis from the date of the incurrence of the damages awarded. The defendant is to bear the entire costs.

Settle judgment on notice.

APPENDIX "A"

Nov. 11, 1969 F. A. PERRINO 3,477,765

ACCELERATION RESPONSIVE DEVICES FOR ANTI-SKID UNITS

Original Filed Nov. 2, 1964 7 Sheets-Sheet 1

FIG 1

INVENTOR.
FRANK A. PERRINO

BY

ATTORNEYS

Nov. 11, 1969 F. A. PERRINO 3,477,765
ACCELERATION RESPONSIVE DEVICES FOR ANTI-SKID UNITS

Original Filed Nov. 2, 1964 7 Sheets—Sheet 2

FIG. 3

FIG. 4

INVENTOR
FRANK A PERRINO
BY
Marshall J. Breen
ATTORNEYS

Nov. 11, 1969 F. A. PERRINO 3,477,765

ACCELERATION RESPONSIVE DEVICES FOR ANTI-SKID UNITS

Original Filed Nov. 2, 1964 7 Sheets—Sheet 3

INVENTOR.
FRANK A. PERRINO
BY

*Marshall J. Boyer*

ATTORNEYS

FIG. 5A

FIG. 7

INVENTOR.
FRANK A. PERRINO
BY

Marshall J. Breen
ATTORNEYS

Nov. 11, 1969 F. A. PERRINO 3,477,765

ACCELERATION RESPONSIVE DEVICES FOR ANTI-SKID UNITS

Original Filed Nov. 2, 1964 7 Sheets—Sheet 5

FIG. 8

INVENTOR.
FRANK A. PERRINO
BY
*Marshall J. Breen*
ATTORNEYS

Nov. 11, 1969 F. A. PERRINO 3,477,765
ACCELERATION RESPONSIVE DEVICES FOR ANTI-SKID UNITS

Original Filed Nov. 2, 1964 7 Sheets-Sheet 6

FIG. 9

FIG. 10

FIG. 11

INVENTOR.

FRANK A. PERRINO

BY

ATTORNEYS

Nov. 11, 1969 F. A. PERRINO 3,477,765

ACCELERATION RESPONSIVE DEVICES FOR ANTI-SKID UNITS

Original Filed Nov. 2, 1964 7 Sheets-Sheet 7

FIG. 12

INVENTOR.
FRANK A. PERRINO
BY
ATTORNEYS

APPENDIX "B"

WILLIAM E. HILL & COMPANY, INC.
Management Consultants
New York London Brussels

640 Fifth Avenue
New York 19
Judson 2–5959
Cable: Hillwamao New York
December 14, 1964

Mr. Robert A. Kloby
Director of Forward Planning
The Singer Company
Elizabeth Plant
321 First Street
Elizabeth, New Jersey

Dear Mr. Kloby:

In accordance with your assignment, a preliminary survey of short-term prospects for the Perma anti-skid control has been completed. The following report summarizes the findings and conclusions of this survey, which were reviewed with you November 11 in Elizabeth.

Sincerely yours,
William E. Hill & Company

*The Singer Company*

PRELIMINARY MARKET SURVEY

PERMA ANTI-SKID CONTROL

The objective of this project has been to assist management in determining the short-term market prospects for the Perma anti-skid control. *Although determination of sales potential was the principal objective, the issue of product performance arose during the course of the project as an important consideration, and the subject has been covered in the report.*

Following orientation meetings with Singer and Perma management, the conduct of the survey included meetings with key industry sources such as automotive brake and safety engineers, auto manufacturer marketing personnel, fleet operators and safety engineers, a fleet operation consultant, specialty automotive part distributors, new-car dealers, and several Perma distributors.

The principal findings and conclusions resulting from this preliminary study are summarized below.

1. Automotive engineers have recognized for many years that it is possible and highly desirable to improve the braking operation by adding to the vehicle braking system a mechanism that would sense an impending locked-wheel condition and prevent the brakes from coming to a completely locked condition.

A system which could do this would allow the car to be stopped somewhat faster and give greater steering control in a panic stop situation. The Perma control is one of several systems that automotive engineers have evaluated in recent years in their search for a system which will give the desired improvement in braking performance at a reasonable price.

2. *The Perma anti-skid control falls short of meeting requirements of automotive engineers, and does not provide the improvement possible in theory.* The consensus of the many engineering tests that have been run on the unit indicate that the Perma control, as compared to a panic or locked-wheel stop, gives improved steering control, *but requires a greater distance to come to a complete stop.* The automotive brake and safety engineers who have reviewed its performance do not agree on the value of the Perma anti-skid control, and are about evenly divided on the issue. One group believes that it is of value in that most drivers cannot handle a skid situation adequately and that the added control of the car obtained is well worth the relatively small loss in stopping distance. *The other group believes that no amount of increase in control justifies the increased stopping distance.*

3. The user aftermarket represents the only apparent short-term opportunity for significant sales volume for the Perma anti-skid control. Prospects are indicated for a sales volume on the order of 100 thousand units during the next two years, depending on sales effort.

 a) The product, with its strong emotional appeal to safety, and with demonstrable characteristics, lends itself to a consumer-directed merchandizing effort. Typical of products of this type, sales volume will depend largely on the amount of promotional effort expended.

 b) *The original-equipment market represents virtually no opportunity at this time for sales of the Perma control.* In addition to the mixed opinion on its worth, this is because of the low value the automotive manufacturer places on safety equipment, considering the poor record of consumer acceptance for high-cost equipment such as the Perma control.

 c) The prospects for significant sales to fleet markets are expected to be quite limited due to the highly cost-conscious nature of fleet operations. Most government fleets are subject to stringent budgetary controls with very litte allowance for extras. Large professionally run private fleets subject their expenditures to careful cost analysis, and the anti-skid control can seldom be justified on a dollars and cents basis, considering the substantial investment cost in relation to reduction of accident cost.

4. To meet the sales volume which appears possible during the next two years, a strong promotional program aimed at the user aftermarket would be required.

a) An intensive promotional program would be needed, because the Perma anti-skid control is virtually unknown and would have to be introduced to the end-user. In addition sales would represent discretionary purchases (versus replacement parts sales) and the item is costly in relation to most other auto accessory purchases.

b) A program to sell the item successfully would likely depend heavily on "high-pressure" promotional methods which include a high sales and advertising cost per unit, sales practices capitalizing on a strong emotional appeal, and perhaps emphasizing strong "personal" selling.

c) Any one of a number of channels of distribution could be effective for this product, including new-car dealers, gas stations, specialty auto accessory stores and a direct selling organization. However, to meet the desired sales volume through any one of these channels, it appears that a supporting program of advertising, demonstrations and other promotional measures would be required.

5. If the Company becomes involved in a sales program directed to the user aftermarket, management will want to recognize the possible problems which might arise, and which have been encountered by other companies in similar situations. In particular, the following points might be considered.

a) *Use of the Singer name both at dealer and user levels should be carefully controlled.* This is essential to prevent misuse of the name in relation to extravagant product claims and also to prevent association in the user's mind with possible undesirable sales and promotional activities.

b) *Management, of course, will want to determine the legal liability which could arise from accidents where it could be claimed that the anti-skid control did not function as represented or where it may have been installed incorrectly or become inoperative.*

c) In light of Singer's dependence on an independent sales organization for marketing of the Perma control, management will want assurance that the program will not resort to the use of door-to-door sales organizations which would employ high-pressure salesmen. This in particular could result in problems possibly harmful to the Singer name and reputation.

d) The question of reliable repair service and replacement parts availability is an important one, and assurance of reliable resources in this respect will need to be considered.

The following section of this report summarizes in detail the findings of the survey.

*The Singer Company*

PRELIMINARY MARKET SURVEY

PERMA ANTI–SKID CONTROL

A. *Product Description and Engineering Evaluation*

1. For many years automotive engineers have recognized that it is desirable as well as possible to reduce stopping distance of a car in a panic stop by holding brakes steady just before a full locked-wheel condition and at the same time reduce the tendency for the car to spin. In recent years many of the automotive companies have evaluated systems which are able to make this improvement in braking performance at a justifiable price. The Perma anti-skid control is one of the devices which have been designed to make this improvement in braking performance. This control operates by quickly sensing a locked-wheel condition and momentarily reducing the brake line pressure to allow the wheel to rotate. The system cycles through this lock-roll-lock-roll condition about *four* times a second until the car comes to a halt.

 a) In theory, by holding the wheels at a 20 percent skid, or by allowing the motion of the car to come 20 percent from skidding and 80 percent from wheel rotation, the car can be brought to a stop faster and kept under better control than in the locked-wheel condition.

 b) The lack of stability, or the tendency for the car to swing around, is particularly serious in the case of Bendix-type brakes which are self-actuating and quite sensitive to the condition of brake lining and adjustment for balanced braking. Disk brakes, which several U. S. manufacturers are offering this year as optional equipment, operate on a somewhat different principle and do not have as great a problem in braking stability as self-actuating types.

 c) In addition to the evaluation made of the Perma anti-skid control, automotive manufacturers have evaluated the Lockheed and Bendix systems. Also, there is a comparable system developed in Europe which was offered on the Jaguar auto as optional equipment. The Lockheed unit operates on the basis of a small flywheel backlash operating through a pneumatic system to reduce brake pressure; the French system is a mechanical system working on each wheel.

2. A number of engineering tests have been run on the Perma anti-skid control comparing its stopping performance in terms of stopping distance and stability with the operation of the car under locked-wheel conditions. *The consensus of the tests is that the Perma control allows a car to be stopped under panic stop conditions with better control, but at the cost of greater*

*stopping distance when compared to locked-wheel conditions.* While this conclusion is definitely substantiated by most of the results, there is some variation between the test results. The results of tests run to date have been summarized in Exhibit 1.

 a) Exceptions to the above conclusions are as follows:

 (1) The test results of the Motor Vehicle Research group, which were sponsored by Perma, showed that under all road conditions use of the Perma anti-skid control allowed the car to stop significantly faster than under locked-wheel conditions.

 (2) In the Cadillac Division test, under glare ice road conditions the Perma control permitted the car to stop in slightly less distance than the locked-wheel situation.

 (3) The Ford tests showed that the car equipped with the Perma control took longer to stop and gave no significant improvement in stability.

 b) *The extent of the testing performed in evaluating the control was reviewed with the auto manufacturers' engineers conducting the tests in most cases, and the amount of time and expense involved was considerable and results are considered to be sound.*

3. There are two points of view among the engineers evaluating the Perma anti-skid control as to the value of a system which brings a car to a stop with better control but which requires greater distance to stop; the engineers are almost evenly divided for and against use of such a system.

 a) *The General Motor Research Center, The Ford Advanced Design Group and Chrysler Brake Laboratory are against use of the control. They believe that nothing should be done to increase the stopping distance required under panic stop conditions, because the last ten feet may be the critical ones in a collision.*

 b) American Motors Safety Engineering and Cadillac Division Brake Design Group are in favor of the system. They believe that the average driver will not remember to pump his brakes under panic conditions and hence is much better off with the anti-skid control. He will have enough control to avoid most road obstructions and stay in a controlled path even though it takes him slightly longer to stop.

B. *Possible Markets for Anti-Skid Systems*

 There are three distinct markets representing significant potential for products such as the Perma anti-skid control.

 1. Original equipment manufacturers, represented by the major automotive companies, General Motors, Ford, Chrysler, and American Motors.

2. Fleets, including privately-owned fleets and government-operated vehicles.

3. The automotive user aftermarket, represented by the sales of parts and accessories after the car is purchased, and including accessories installed by the new-car dealer.

## C. *Market Characteristics and Requirements*

Following is a summary of the key market requirements relating to automotive equipment such as the anti-skid system.

1. The automotive manufacturer has two essential requirements, dependability and value. These requirements are reflected in the typical evaluation of a possible new device; *first, assurance that the device is sound from an engineering point of view,* and secondly, consideration as to profit, which is a function of user acceptance (in terms of the added price he is willing to pay) and the added cost to the manufacturer. Safety features have typically received low ratings in relation to these criteria.

 a) The automobile companies are slow to accept new accessories because of the desire to thoroughly prove out any new device for reliability. For example, the power-braking system on the Ford, similar in complexity to the Perma anti-skid control, took over two years to develop even after the basic design was well established. All new accessory designs have hundreds of thousands of miles of testing before final acceptance. In this respect the statement was made by several of the auto companies that from a reliability point of view they believe the *Perma anti-skid control is below their standards.*

 b) An example of the rather low rating that auto companies put on safety items is the case of dual brakes. This item has been put only on the Cadillac and Rambler; it permits partial brake operation even though a hydraulic line is broken. Although the cost is low, about $1.50 in manufacturing costs, other manufacturers have not added the device, primarily because they do not believe the consumer will recognize that amount of additional value.

 c) While it is difficult to find a product which is exactly parallel to the anti-skid control, the record of seat belts probably comes closest. These cost in the $25 to $35 range during their first year. Through the 1950's American Motors was the only manufacturer to offer belts as an accessory, and although belts had unqualified support of safety organizations the company realized sales on under 1 percent of cars until the legislation of the 1960's.

2. The requirements of fleet markets in total center around cost consideration, particularly in the case of government and major fleet operations. The nature of these cost requirements are different, however, between the two major market segments.

a) The key characteristic of government fleet purchasing is the overwhelming concern with price. Virtually all purchasing of motor vehicles and accessories is subject to public bidding and review. Hence, except where special equipment is required to accomplish a particular job, the government vehicle is strictly transportation and the cheapest equipment available is purchased.

 (1) The Federal Government fleet has the most stringent financial limitation placed on it. All of their vehicles, with accessories, are purchased for under $1,500. This leaves no allowance for anything but the most necessary accessories. This ceiling has been set by law and there is no indication that it will be raised in the near future.

 (2) The GSA, which purchases and operates the largest share of government vehicles, has shown interest in many new safety devices and has been discussing these devices with automotive companies. However, the agenda of their last meeting in Detroit this November did not include the anti-skid control, other devices being considered of higher priority.

 (3) Smaller government fleets, such as local police vehicle fleets, have indicated interest in the anti-skid control. Where vehicle purchases are not subject to close public scrutiny and key persons influencing the sale may have a freer hand in choosing the equipment, the cost factor may be secondary. A number of these smaller fleets have shown initial interest in the system and the Perma control has been installed in a few trial cars.

b) The principal concern of the commercial fleet is cost of operations. These cost considerations fall into two areas: first, the cost of depreciation (the relationship between purchase price and eventual resale on the used-car market) as it affects the car and the accessory equipment, and second, the cost of operation including fuel, maintenance, insurance, repairs, etc. In the large professionally managed fleets cost is the primary concern, although allowance is often given to match fleet equipment with the personally owned vehicle the driver is accustomed to.

 (1) The large fleet operator looks at his costs as divided quite equally into three parts—depreciation, direct operating costs and all other, including the costs of accidents. Of the total cost of operation the direct cost of accident (the sum of insurance and non-insured accident costs) represents a minor 9 percent in the average business fleet. With this relatively low base, very little cost for accessory equipment can be justified in an attempt to reduce it.

 (2) The costs of accidents are normally 85 percent covered by insurance, and unlike private auto insurance, the

premium rate is negotiated annually with the underwriter. The rate varies from fleet to fleet, but is nearly always based on the accident experience of the previous year. Hence the large fleet operator will only consider installing a safety device when it can be shown that it will reduce the accident cost in relation to its cost.

(3) The fleet owner often will purchase accessories which have value from an employee relations point of view. The rule of thumb on this type of purchase usually is to give the driver of a company car equipment he has come to accept in his own car. Hence, after power brakes rose to a rate in new car installation of around 50 percent the large fleets started to purchase cars with power brakes. The same situation has occurred with the automatic transmission and the 8-cylinder engine. On this basis the fleet operator would not purchase a new accessory until after it had received fairly wide consumer acceptance.

(4) The cost of depreciation over the time that the fleet holds a car, usually two to four years, is a factor in choice of accessories. The fleet operator recognizes that the accessories depreciate in market value much faster than the car itself. In fact, only five accessories are recognized as having resale value; these are automatic transmission, radio, power brakes and steering and air conditioning. All others, including Perma anti-skid control, are nearly valueless on the used-car market. This fast rate of market depreciation would be a further barrier to sales in this market.

(5) In addition to the large professionally managed fleets there are, of course, small fleets that are not subject to close cost control. These fleets are often run by one man with a relatively free hand over purchases, and who may recognize unusual operating factors such as poor road conditions. Many of these operators may be in a position to purchase a device such as the anti-skid control simply because the key man is convinced of its value.

3. There are a number of important requirements which would have to be met to successfully sell the Perma control in the user aftermarket.

a) Promotion to the user is the most important market requirement. The anti-skid control, in spite of the considerable amount of notice received in trade press, is virtually unknown to the car-owning public, and its story must be explained. In addition, the control is an item that a car owner does not have to have, and it therefore must be promoted more intensely than service or replacement parts which are necessary to operate his car. Promotional tech-

niques which might be used include television "spot" announcements, group demonstrations, movie shorts, newspaper and magazine advertising and personal calls.

b) Demonstrated reliability recognized by the motoring public would be essential to marketing of this product, both because it is new and because it becomes a part of the braking system of the car. Reliability could be demonstrated in a number of ways, including association of the control with established and *universally respected names such as Singer*. In addition, the record of fleets or other groups that have had good field experience with the device would be helpful.

c) Installation service for the unit must be competent. Although the unit does not require much time to install, the person doing the job must be skilled. Because the unit goes into the braking system, all installation work must be sound.

d) Credit would be needed for this item because the relatively high cost of the Perma control cannot be met by the typical aftermarket purchaser in a cash payment.

### D. *Distribution to the User Aftermarket*

Three established distribution systems represent possible channels for sales of the Perma anti-skid control, and meet to varying degrees the requirements for serving the user aftermarket. A fourth means of distribution—direct-to-user sales—would represent a fourth possibility. Effective use of any of these distribution systems would require strong promotional support.

1. New-car dealers presently sell independently manufactured accessory items as part of the new-car sale or when the new car is serviced. The dealer operates in a highly competitive environment in his sales of new cars. For instance, the average Ford dealer makes only $27 on each new-car sale, with General Motors dealers only slightly better. Accessories, on the other hand, have a much higher margin and present the dealer and his salesmen with a better profit opportunity than the car itself. New-car dealers would be interested in handling the anti-skid control as a relatively high-profit accessory item, and Perma's New York distributor appears to have had some limited initial success in placing the item with dealers.

2. The gas station, particularly selling through the TBA (tires, batteries and accessories) divisions of national oil companies, would present a means of distribution. The typical gas station is faced with a highly competitive situation in sales of gasoline and the TBA program is an effort to broaden the station's sales into higher-margin items. This channel is of particular interest because of the favorable reaction to the unit developed with Phillips Petroleum, which has been most interested in promoting the item. The gas station is able to offer credit through their credit cards. Although many stations would have the necessary installation competence, small stations do not have the skill to install the unit. In addition, the gas sta-

tion is not a promotional outlet and would have to be backed with an independent promotional program.

3. The independent automotive specialty chains could possibly present a good outlet for the Perma control. These selling and installing organizations include U. S. Royal, Firestone, B. F. Goodrich, Vanderbilt, Midas Muffler and others. These outlets base their business on strong promotion and advertising and could handle the anti-skid control. The issue with this type of distribution is that they are very selective as to products handled. Their objective is to handle products which will make most efficient use of salesmen's time, and hence prefer established products for which user acceptance is well established and which can be sold with the minimum of sales time and effort. Also, in line with the nature of these operations, there is a requirement for rapid turnover of stock; one major chain sets a minimum of four times a year. This limits the number of different products these stores will carry.

4. Direct user sales has been shown to be a possible method of selling anti-skid control. Several of the Perma distributors have had limited experience in selling through a number of direct-sale operators. Techniques have included demonstrations, following leads from advertising or from promotional talks, and neighborhood gatherings. This type of selling gives an opportunity for very heavy promotional effort. Arrangements would have to be made independently by the salesman for installation and credit. Large businesses in other products have been developed on this distribution basis and it can be a highly effective method of selling certain specialized products.

### E. *Short-Term Market Prospects*

Based upon the results of this preliminary survey, it appears unlikely that the stated sales objective for the Perma control will be attained. With the prospect for sales to the automotive manufacturers virtually nil in the *foreseeable future,* and limited prospects in the fleet market, significant sales volume during the next two years will have to be realized from the user aftermarket. An aggressive, promotionally-oriented marketing program could probably develop sales of approximately 100 thousand units within the next two-year period. Estimates of sales to the principal markets are summarized in Exhibit 2.

1. Based on evaluation by major automotive manufacturers, the Perma anti-skid control does not meet established requirements, and cannot be expected to find a place in the OEM market under present conditions. In the longer-range future, however, it is possible that anti-skid controls of some type may be included in the braking system of automobiles as original equipment.

2. Despite the large number of vehicles operated in civilian and government fleets, the sales potential for the Perma control

appears quite limited. It is estimated that approximately 500 units could be sold the first year, and from 2,000 to 4,000 the second year. It is expected that these sales would be to small civilian fleets. The strict cost considerations under which professionally run fleets operate cannot justify a high-priced item like the Perma control, and impose a severe limitation to sales prospects in this market.

3. Depending on the effectiveness and intensity of sales effort, it is possible that on the order of 25,000 units could be sold in the user aftermarket during the first year, and perhaps two-to-three times this volume the second year, or from 50,000 to 75,000 units. It is most likely that these sales will be through car dealers and direct-sales organizations. TBA and specialty automotive products companies contacted as part of this survey expressed strong reluctance to taking on the Perma control —mainly because their operations are not geared to promotion and introduction of new products.

4. Although it is beyond the scope of this preliminary survey to evaluate in depth the various distribution methods open to the Perma control, or to recommend a marketing program, it is apparent that the anti-skid control has certain characteristics which could support a major direct-selling operation.

 a) Involving, as it does, family safety, the anti-skid control is subject to promotion on a strong emotional basis. Coupled with this is the fact that it is a product which is demonstrable in familiar and understandable terms to the large car-owning population. Selling at a price well over $100, there is a good margin for significant sales commissions.

 b) In recent years a number of consumer products having some of the above characteristics have been very successfully sold on a door-to-door basis and sales volumes so developed have been impressive at the peak of such programs. Sales volume is limited virtually only by the number of salesmen employed. Products such as water softeners, home fire and burglar alarms, storm windows, siding, and vacuum cleaners are examples of products sold by this type of sales operation.

 c) Many of these selling organizations have engaged in the doubtful practices to which direct sales activities are subject, and have experienced serious financial and legal programs. In this regard estimates of possible sales of the Perma control have assumed good control of sales and promotional activities and careful selection of sales representatives. Marketing by means of the typical door-to-door operators on an unrestricted basis would represent a very different set of conditions and could present much greater sales prospects.

Exhibit 1

RESULTS OF ENGINEERING TESTS OF THE PERMA ANTI-SKID CONTROL

| Agency Sponsoring Testing | Location | Approximate Results of Stopping Distance Tests | | Stability of Car During Locked-Wheel Stop | Reliability of Unit | Overall Estimate of the Worth of the Unit |
|---|---|---|---|---|---|---|
| | | Dry Pavement | Wet & Slippery | | | |
| Perma Research & Development | Motor Vehicle Research (Maine & New Hampshire) | 15% less stopping distance with Perma | 5% to 20% less distance with Perma | Considerable increase in stability | Laboratory tests of certain parts of the unit show reliability | Very valuable |
| Cadillac Motor Car Co. (div. of General Motors Corp.) | Delco Moraine Div. of G.M. (Dayton, Ohio) | 5% to 10% more distance required with Perma | Slightly less stopping distance with Perma | Increased stability | Not tested | Has some value in control of car even though longer stopping distance |
| General Motors Technical Center | G.M. Proving Ground (Detroit) | 9% to 18% more distance required | 4% to 27% more distance required | Increased stability | Not tested | Gain in stability does not justify longer stopping distance |
| Chrysler | Chrysler Test Facilities (Detroit) | 5% to 15% more required | 5% to 15% more required | Increased stability | Not tested | Gain in stability · does not justify longer stopping distance |
| Ford | Ford Test Facilities (Detroit) | 1% to 10% more required | 5% to 10% more required | No significant increased stability | Not tested | Not of value |
| American Motors | No formal tests made Unit on test car in car pool | — | — | Increased stability recognized | Not tested | Has some value in control of car even though longer stopping distance |
| Phillips Petroleum | Phillips Test Track (Bartlesville, Oklahoma) | — | 5% to 20% more required | Increased stability | Not tested | Unit has value in control of car; would also like to see shorter stopping distance |

William E. Hill & Company, Inc.

Exhibit 2

Perma Anti-Skid Control

PRELIMINARY ESTIMATE OF MARKET POTENTIAL

SUMMARY BY PRINCIPAL MARKETS

| Market | Key Factor in Selling Market | Rate of Penetration | Potential Unit Volume | |
|---|---|---|---|---|
| | | | 1st Year | 2nd Year |
| Original Equipment Manufacturers | (1) Engineering acceptance | None expected | — | — |
| | (2) Cost versus value on market | None expected | — | — |
| Fleet | | | | |
| Civilian | Reduction in operating costs | Slow | 500 | 3,000 |
| Government | Low initial cost of article and equipment | Very slow | 150 | 1,000 |
| User After-Market | Strength of promotional effort | Potentially rapid, depending on promotional program | 25,000 | 70,000 |

William E. Hill & Company, Inc.