## AMERICAN MACHINE & METALS, Inc. v. DE BOTHEZAT IMPELLER CO., Inc.

### No. 113, Docket 21487.

United States Court of Appeals Second Circuit.

Argued Dec. 14, 1949.

Decided Jan. 17, 1950.
Writ of Certiorari Denied June 5, 1950.
See 70 S.Ct. 1025.

McLaughlin & Stickles, New York City, for defendant-appellant. Samuel Williston, of the Massachusetts Bar, Boston, Mass., Chester B. McLaughlin, Alfred P. O'Hara, Mario Lorenti, New York City, of counsel.

Alphonse Kenison, New York City, for plaintiff-appellee. Leonard P. Moore, Charles Pickett, Edward R. Neaher, New York City, of counsel.

Before AUGUSTUS N. HAND, CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The difficulties which may be encountered in construing a contract which has been carefully prepared by skillful counsel are well illustrated by this appeal. After a lengthy period of negotiations the parties to this suit executed a written contract on April 3, 1934 in New York City which was undoubtedly intended to be a complete embodiment of the agreement they had reached, but which has furnished the basis for protracted litigation.

The appellant, De Bothezat Impeller Company, Inc., is a Delaware corporation which then was, and for some years previously had been, manufacturing and selling impeller blowers and related products for the movement of air in accordance with the principles advocated by Mr. De Bothezat, a skilled engineer in this field. It was in part protected by United States patents covering his inventions. The business had not, however, been a financial success and arrangements were made for the appellee to take it over, together with the plant, equipment, patents and all other assets of the appellant including unfinished products being manufactured, and conduct it at its own expense. Appellee was to pay the appellant certain stated percentages of the annual aggregate net sales, with a minimum monthly payment which was to be credited against the overall amount as and when more became due. After a fifteen year period of operation, however, the appellee had the option, upon a notice of three months to elect to pay a sum, equaling the aggregate of all payments which had become due under the contract during the preceding six years, in full discharge of its liability to pay thereunder.

There were provisions, written with careful attention to detail, to the effect that there should be transferred to the appellee all of the appellant's patents and patent applications and its plant, records, inventory and all of its equipment except some which was leased to the appellee. Appellee was given the right, however, to use and dispose of the plant equipment as it pleased and at the end of a stated period to purchase the leased equipment at the nominal price of one dollar. Additional provisions required the appellee to feature the name "De Bothezat" in the sale of the products made under the contract; "to use its best efforts" to promote sales; and to furnish adequate audits of its operations.

The contract ran for an indefinite time, but appellee was given the right to terminate it at any time after the expiration of one year by giving the appellant six months' notice of its election to do so and in the event of such termination appellee was required to transfer to the appellant all the patents it had obtained under the contract and also any other patents or patent applications it had for the contract products, providing the appellant reimbursed it for expenditures it had made in connection with their issuance or prosecution respectively. And for one year after such termination of the contract the appellant was given an exclusive license under them regardless of reimbursement. The appellee was also bound to convey and deliver to the appellant all of the plant and equipment, which it had on hand, that it had received from the appellant under the contract and to permit the appellant to inspect its books and records relating to the contract business and to make copies of them.

The appellee took over the appellant's business and property connected therewith and has since been operating under the contract, which had been modified by mutual consent at times in ways not now material. It was contemplated when the contract was executed that the appellee would form a new corporation, having the name "De Bothezat" in its title, to which the appellee would assign the contract and which would

carry it out. This was done and for a while the new corporation did conduct the business pursuant to the contract but later that corporation was dissolved and merged into the appellee which has since conducted the business in a successful manner.

In 1946, when the most valuable De Bothezat patent was about to expire, the appellee took up with the appellant the question of its right to terminate the contract and then continue to make products the same as, or similar to, the contract products. The discussion which followed brought to the surface differences between the parties as to the meaning of certain provisions in the contract relating to this subject and such attempts as were made to reconcile these differences failed.

The foregoing will be, it is hoped, a sufficient background for understanding the issues presented in this appeal, involving the merits, so to speak, of the litigation which has resulted from the appellee's claim of right to terminate the contract and continue in what, for convenience, has been called the contract business and the appellant's denial of that right.

This litigation has proceeded as follows. The appellee brought this suit on February 6, 1947 for a declaratory judgment as to its right to continue the business after terminating the contract. The first appeal to this court was from an order before answer dismissing the complaint on the ground that there was no justiciable controversy under the provisions of the Declaratory Judgments Act, 28 U.S.C.A. §§ 2201, 2202. We reversed and remanded. American Machine & Metals, Inc. v. De Bothezat Impeller Company, Inc., 2 Cir., 166 F.2d 535. The appellant then moved to dismiss on the ground that there was in fact no dispute between the parties. This motion was denied. D.C., 8 F.R.D. 324. The appellant then answered and set up six counterclaims or "special defenses" as to which the appellee replied by alleging their insufficiency. The appellant then moved to strike these allegations and that motion was denied. D.C., 8 F.R.D. 306. Following this, the appellee moved for a pretrial conference. This motion was granted. D.C., 8 F.R.D. 459. The judge at this conference decided that four of the special defenses pleaded by the appellant were insufficient and ordered them stricken. He ordered a separate trial of the issue of the appellee's right to continue the business after terminating the contract as presented by the pleadings other than those stricken and "that the trial of such of the remaining issues in this action as are not disposed of prior to such trial be held thereafter, at such time as the Court may fix upon further application, after final determination of the trial of the separate and several issues." D.C., 82 F.Supp. 556. An appeal by this appellant was dismissed by this court because the order was not final. 2 Cir., 173 F.2d 890.

The suit was then tried by court as ordered and a judgment was entered declaring that the appellee could terminate the contract and of right continue in the same business. In it the court expressly determined that there was no just reason for delay and expressly directed that final judgment be entered upon the separate issues there considered, as provided in amended Rule 54(b), Federal Rules of Civil Procedure, 28 U.S. C.A. This appeal is from that judgment and also brings up the issues sought to be raised on the appeal we previously dismissed as above stated.

Much of the time at the trial was devoted to the presentation of evidence relating to the issue of reformation of the contract which was raised by the appellant in the alternative. But since the appellant, both in its reply brief and at the argument, eliminated this issue by waiver, we shall say no more as to it.

On the merits, the trial judge held that the contract was clear and unambiguous as to the right of the appellee to terminate it upon giving the notice and complying with the conditions above set forth. He also held that the contract clearly and unambiguously established the right of the appellee to continue in the fan business after termination of the contract. We agree.

The argument of the appellant to the contrary may be summarized as follows. The business assets and good will were sold and the fact that certain patents were included did not make the contract one for the pay-

ment of royalties. Indeed, it is pointed out that a provision was inserted to the effect that payments falling due under the contract should not be diminished either by the expiration or the invalidation of any patents. And it is urged that the thirteenth paragraph contains language which in terms forecloses the claimed right of the appellee to make and sell fans after termination. That paragraph reads in pertinent part as follows: "Thirteenth: The De Bothezat Company hereby consents to the use of the name 'De Bothezat' in the corporate title of the New Company and to the sale of the Products thereof under the name 'De Bothezat.' Metals Corporation agrees that it will use the name 'De Bothezat' in its literature and sales promotion in connection therewith. Upon the termination of this agreement, the right of Metals Corporation or the assignee of its interest herein to use the name 'De Bothezat' for any purpose shall cease. Metals Corporation further agrees that the New Company will not engage in the manufacture and sale of any products which compete with the Products to be manufactured and sold hereunder.

" * * * "

From this the appellant insists that the phrase "Upon the termination of this agreement" which opens the third sentence just above quoted should be read to modify the fourth sentence also. That is to say, the argument runs, the controversy would not arise but for misleading punctuation, and can be solved simply by removing the period after the word "cease" and substituting for it whatever will make the two sentences one. That the two sentences are tied together, it is urged, is plainly indicated by the use of the words "further agrees" in the fourth sentence. This thread of, as will appear, a fine-spun argument is, it is said, further reinforced by pointing to the use of the words "further agrees" in the eighth paragraph, where after several undertakings on the part of appellee to make payments to appellant, appellee "further agrees" to pay another sum: the words are there used to "tie together the two sentences as related to one another."

To meet appellant on its own plane of argument, however, it appears that the phrase "further agrees" is used in the eighth paragraph in a sentence following one which merely sets forth the time at which payments are to be made and does not constitute an undertaking to pay. The reference back is in fact to the next preceding sentence. While we of course put no reliance on the parallel, we think the fourth sentence in the thirteenth paragraph, above quoted, likewise refers back to the next preceding sentence. In other words, we believe that in the first three sentences of that paragraph the appellee is granted the right to use the name "De Bothezat" in the title of the new company to be formed and in the sale of the products to be made, then appellee "agrees that it will use the name" in its literature and sales promotion, but upon termination of the contract the right to use the name is to cease. The undertaking not to compete is another, or, as it was put, a "further" agreement, having no reference to the qualification put upon appellee's right to use the "De Bothezat" name.

One of the reasons we believe this to be true is that the agreement not to compete relates to "the products to be manufactured and sold hereunder," that is, to the products sold and manufactured under the contract only. After the termination of that contract there would be no such products with which to compete and thus no need for any restriction as to competition with them. To explain this, however, the appellant rather ingeniously asserts that the words "Products to be manufactured and sold hereunder" mean simply the type or kind of products manufactured, rather than what were actually made, under, that is, during the life of, the contract. This, it says, follows, because otherwise this provision would be unnecessary, and in fact tautological, since elsewhere in the contract the appellee had agreed to use its "best efforts" to promote the sale of the products made under the contract and such an agreement necessarily implies one not to compete with those products.

But without an express provision not to compete with the products made under the contract, the appellee or the "New Company" might conceivably use its "best efforts" to manufacture and sell them and at the

same time, it would seem, properly and lawfully manufacture and sell competing ones, at least if it were faced with outside competition from products commercially better than the contract products. Mechanical Ice Tray Corp. v. General Motors Corp., 2 Cir., 144 F.2d, 720, 725-26, certiorari denied 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406. But even if an agreement to use one's "best efforts" or "best energies" to promote the sale of products to be manufactured would be held to imply that there should be no competition, as it was in Randall v. Peerless Motor Car Co., 212 Mass. 352, 99 N.E. 221, it does not follow that it is repetitious or unnecessary to state the legal implication expressly. Any careful draftsman does just that, time after time, to avoid needless dispute. Indeed, in the contract before us, that was done more than once. For example, the contract provides that appellee shall not be liable for any payment accruing after termination: this would of course be implied from the provision permitting termination, but this instrument was for the most part quite carefully drawn.

It would seem that it is only reasonable to construe the third and fourth sentences of paragraph thirteen as dealing with separate things. The first made it one of the conditions upon termination that the appellee's right to use the name "De Bothezat" should be relinquished for every purpose. The other made sure that during the life of the contract the volume of manufacture and sale of the products and consequently the aggregate net sales on which payments to the appellee were to be computed should not be diminished by any diversion of the appellee's efforts or facilities to the supplying of similar products. One need not go further, however, than the actual words themselves, as the trial judge suggested. The first sentence begins with words that relate it to the time following termination and the second ends with words which relate it to the time during the operation of the contract. And that leaves the appellee's right

to terminate unfettered by paragraph thirteen.

Nor are we persuaded by appellant's contention that the fourth sentence, if it is to be given the meaning we believe it has, would be out of place. Appellant suggests that, if it had been intended to have that meaning, it would have followed the first sentence in the eighth paragraph, which is the clause requiring appellee to use its "best efforts" to promote the sale of the contract products. The fact that, were appellant's construction of the sentence in question to be given effect, it also might seem out of place [1] is not, perhaps, a complete answer to this contention. The whole of paragraph thirteen deals, however, with the rights and duties of the new company to be formed, and thus there was some reason for putting the sentence where it is. The most that can be said is that the position of the sentence is wholly inconclusive.

Appellant sets forth another argument from a supposed parallel, claiming that it is significant that its own undertaking not to compete with appellee in the manufacture or sale of the products is expressly qualified as one not to do so "during the life of this agreement," while appellee's undertaking is not so limited; the latter consequently must be construed, this contention is, to refer to the time after termination. Perhaps it is laying too much importance on the word "hereunder" in the appellee's agreement not to compete, but it would seem that this word serves the same purpose as does the phrase "during the life of this agreement." It is to be noted also that there are several instances where the contract specifically refers to the period after termination. The suggested parallel, then, is at best a weak one, and insignificant in view of other parallels of equal force.

Appellant argues that the meaning we believe the parties to have intended would lead to an absurd result since they had agreed that after fifteen years the appellee could make a lump sum payment and have

1. Seemingly, in that view, the sentence should have been made a part of the tenth paragraph, dealing with the method and effect of, and the parties' rights and obligations after, termination.

the contract continue indefinitely without further obligation to the appellant, while under our construction appellee will be able to accomplish the same result without making any payment. Or, to put it another way, it makes the agreement illusory, one to pay or not to pay as the appellee pleases. This, however, loses sight of the fact that upon termination the appellee must comply with the conditions above mentioned. It could pay the lump sum and be freed of those conditions or terminate subject to them. The fact that the lapse of time, resulting in the expiration of the patents, has made compliance with those conditions easy, or easier, is beside the point. The appellee was given an election and it is to be taken for granted that it would, as it might, choose to act as it considered most to its advantage.

As we have said, it would seem sufficiently clear that reference to the words actually used by the parties is enough to require affirmance on the question of construction. But even the slightest doubts we might have on the subject must be cast aside when we consider that the contract here arrived at itself shows that it was very carefully prepared by counsel [2] and that what the appellant seeks is a restriction to be imposed upon appellee's engaging in the fan business after termination of the contract. Had the parties contemplated such a restriction, at least in view of the care in draftsmanship, shown by counsel, it is but reasonable to expect that it would have been expressed in wholly certain terms and not left to be inferred from a series of inconclusive parallels and strained definitions. While, of course, the contract here in question involved more than a patent license, we think that Eskimo Pie Corp. v. National Ice Cream Co., 6 Cir., 26 F.2d 901, is closely apposite. There a patent licensee agreed not to deny the validity of the patent, and although other undertakings were "express-

ly restricted to the term of the contract" this one was not. It was held, nevertheless, that after termination the former licensee could attack the patent's validity, the court saying that, to have the opposite effect "the agreement should be in such express and clear words that the intent could not be doubtful." 26 F.2d at page 902.

In addition, were appellant's construction to be given the contract, serious doubts would arise as to its legality. For the agreement not to compete would be, in terms, unlimited as to time or place and thus, perhaps, a general restraint of trade [3] and it would not be ancillary to the sale of, or reversion of a sold, business.[4] Cases cited by appellant and upholding covenants not to compete as not unreasonable restraints of trade, like Diamond Match Co. v. Roeber, 106 N.Y. 473, 13 N.E. 419, 60 Am.Rep. 464; Tode v. Gross, 127 N.Y. 480, 28 N.E. 469, 13 L.R.A. 652, 24 Am.St.Rep. 475; and Tarry v. Johnston, 114 Neb. 496, 208 N.W. 615, are not strictly in point, as they all involve a sale of, or the reversion of a sold, business. Neither are those patent cases, relied upon by appellee, like National Lockwasher Co. v. George K. Garrett Co., Inc., 3 Cir., 137 F.2d 255, and McCullough v. Kammerer Corp., 9 Cir., 166 F.2d 759, certiorari denied 335 U.S. 813, 69 S.Ct. 30, holding invalid covenants by a licensee not to compete with the patented device during the term of the agreement, since here something more than a license agreement is involved. While we do not decide that an agreement by appellee not to compete after termination would be illegal, we do think that the doubts as to its legality above expressed at least to some extent strengthen the conclusion we have previously reached, after the canon of construction that the court will presume that the parties did not intend to make an unlawful contract.

---

2. The evidence also shows that there were seven drafts, four of which were made by appellant's counsel, and miscellaneous changes made before agreement was finally reached.

3. See Diamond Match Co. v. Roeber, 106 N.Y. 473, 484, 13 N.E. 419, 423, 60 Am. Rep. 464.

4. The contract here is more like a lease than a sale of a business. And appellee, under the contract, retains after termination its own factory, equipment, raw materials, trade marks, good will, distribution facilities and the like.

But appellant contends that under the law of New York, controlling here,[5] it would be "unreasonable" and "inequitable" to hold for appellee, and Cammack v. J. B. Slattery & Bro., Inc., 241 N.Y. 39, 148 N.E. 781, is relied on as authority for this. As was pointed out in New York Telephone Co. v. Jamestown Telephone Corp., 282 N.Y. 365, 373-74, 26 N.E.2d 295, 298, the Cammack case involved "a contract terminable at will to pay royalties for the right to manufacture an article, according to plans and designs of another person" and held that the obligation "continues until the contract is effectually terminated, and effective termination does not arise from mere notice of intention without relinquishment of benefits derived from the contract." Here, however, the obligation to make payments is expressly made terminable under certain express conditions, one of which was not the going out of the fan business, but several of which required the relinquishment of some of the "benefits derived from the contract", e. g., patents obtained under the contract, as well as benefits not derived from the contract, i. e., patents obtained or applied for by appellee on the contract products. In the Cammack case, it was thought equitable to imply the condition upon termination of going out of the radiator business where the contract was altogether silent as to termination and the conditions thereon. Counsel here took more care and did not leave it to the court to determine what probably would have been said had the question of termination and the conditions upon it been considered.

 Perhaps of greater difficulty, though of less complexity, than the matter of interpretation of the contract, however, are the questions raised by the striking of the four separate "special defenses" numbered two, three, four and six, as to which a separate trial was ordered. These "defenses" were all based upon allegations of breach of contract, as follows: that appellee wrongfully converted or destroyed the equipment leased to it under the contract, wrongfully and willfully did not use the "De Bothezat" name in the promotion and sale of the products, failed to furnish a "reasonably detailed" audit of operations, and failed to use its "best efforts" to promote the sale of the products. It was alleged that these acts or failures to act have damaged appellant in the amount of $100,000, $50,000, $10,000, and $50,000 respectively, and that the first three have made it inequitable to permit appellee to exercise at all its option to terminate without making further payments, even if, as we have held, that option would otherwise be allowable under the contract, and, as well, to exercise it and at the same time remain in the fan business. The court below held that "it is the law of New York that a wrongful breach prior to termination, and not, in itself causing irreparable injury, but causing such injury if the contract were to be terminated, can not defeat the right to terminate expressly granted in the contract." 82 F.Supp. 556, 560. The court based its conclusion on those cases holding that a breach by a defendant prior to notice of termination does not make ineffective a termination otherwise expressly permissible;[6] Randall v. Michelin Tire Co., Sup.Ct., 137 Misc. 570, 244 N.Y.S. 44, where a motion to dismiss a complaint charging wrongful termination of a contract expressly permitting termination was granted; New York Telephone Co. v. Jamestown Telephone Corp., supra, 282 N.Y. at page 373, 26 N.E.2d 298, where it was said that a right to terminate expressly granted by contract "is absolute"; Mason v. Electrol, Inc.,

5. Under the New York rules of conflict of laws, to which we must refer, Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, the law which the parties intend to control will ordinarily be followed. Dougherty v. Equitable Life Assurance Society, 266 N.Y. 71, 193 N.E. 897; Swift & Co. v. Bankers Trust Co., 280 N.Y. 135, 140, 19 N.E.2d 992, 994. Here the contract provided that it should "be construed in accordance with the laws of the State of New York."

6. United States Aluminum Co. v. Calvert Lithographing Co., App.Term., 49 Misc. 491, 97 N.Y.S. 1042; Motion Picture Trade Directory Co. v. Wallace, App. Term, 1st Dept., 186 N.Y.S. 80, affirmed without opinion 197 App.Div. 938, 188 N.Y.S. 937 (1st Dept.).

292 N.Y. 482, 487, 55 N.E.2d 747, 749, where the Court of Appeals said that language conferring the power to terminate "ought not to be artificially altered by us, unless its natural meaning is unworthy of the whole of the language the parties have used"; and more or less conflicting dicta. These cases, as the trial court recognized, do not reach the issue here, for they did not involve claims of irreparable harm resulting from an alleged or established breach. Nevertheless, they do indicate that the New York courts will give effect to a termination clause according to its terms, and this indication is not affected by such cases as MacDonald Bros., Inc. v. Halston, Sup.Ct., 63 N.Y.S.2d 909, suggesting that a purely malicious cancellation, though termination is allowable under the contract, is possibly actionable at law. In addition, in Jones v. Commercial Travelers' Mut. Accident Ass'n, 201 N.Y. 576, 95 N.E. 1130, the Court of Appeals, without opinion, dissolved an injunction against an insurer restraining it from exercising its contractual right to cancel an accident policy, the injunction having been issued on the ground that the insured had become uninsurable and thus would be caused irreparable harm. See Sup.Ct; 114 N.Y.S. 589. This case, it is true, also does not reach the question here, for the irreparable harm was not caused by the breach, but it does show that irreparable harm in and of itself is insufficient to prevent otherwise lawful termination. We have recently called it an "extreme step" to qualify an otherwise absolute power to terminate by requiring termination to be in good faith, Bushwick-Decatur Motors, Inc. v. Ford Motor Co., 2 Cir., 116 F.2d 675, 677, and should not take the even more extreme step of implying, from the New York law on the subject, a limitation upon that power that its exercise must not cause irreparable harm. This is not to say that, considered as an independent question, we might not arrive at a contrary result, though we have said, in the Ford case above, that it is not for the courts to correct a situation like that; but we are bound to attempt to divine what the courts of New York would do were the case presented to them,[7] and the indications are as we have pointed them out.

Appellant's contention that, even if the alleged breaches of contract do not equitably bar appellee from terminating the contract, they prevent it from engaging in the fan business after termination is not any the more persuasive. This contention, as best as we can make it out, is based upon the premise that the relation created by the contract here was a fiduciary or "quasi-fiduciary" one and that a breach of fiduciary duty causing harm to accrue to the obligee or beneficiary, as he may be called, after the termination of the relation will so survive that termination as to prevent the fiduciary from engaging in otherwise lawful conduct. Put more specifically, the argument is that because appellee's alleged breaches of contract supposedly have worked to prevent or impede the successful resumption by appellant of the fan business, appellee should not be permitted to engage in that business. With this we cannot agree. Viewing the alleged breaches of contract separately, it is plain that an award of damages will provide an adequate remedy as regards the alleged conversion of equipment and failure to promote the contract products as fully as the contract required.[8] On the other hand, it

7. See footnote 5 supra. Appellant's and appellee's principal offices are in New York, though appellee is incorporated in Delaware and its manufacturing is done in Illinois. The payments under the contract were to be made in New York and notice of termination was to be considered sufficiently delivered if mailed by registered mail, postage prepaid, to appellant's New York offices.

8. Indeed, as regards the "Sixth" defense, relating to the failure to promote the contract products, there was no specific allegation made that it rendered inequitable the exercise of appellee's option to terminate, if otherwise existent, an allegation which was made as to the other three dismissed defenses. Since, however, the trial court considered all four of them as going to the issue of termination and continuance in the business, and since the prayer for relief contains in general terms a prayer that it be declared that appellant be not permitted to terminate or continue in the business, we have not considered this defect in the "Sixth" defense fatal.

is possible that, as to the "Third" and "Fourth" defenses, the legal remedy for the omissions to act alleged by them would be inadequate, since the amount of pecuniary damage caused to appellant would not be easily ascertainable. The theory on which some form of relief might be granted, conceivably, could be predicated—as regards, for example, the alleged failure to use the "De Bothezat" name—upon the parties being, if not in a strict fiduciary, at least in something approaching a fiduciary, relation;[9] the destruction by the one party of the other's good will,[10] which is "in a very real sense" property;[11] and consequently a breach of duty.[12] But this we need not now decide, for it would seem plain that the restraining of appellee from engaging in the fan business would not be an appropriate equitable remedy. That is to say, while possibly, before termination, appellee could be enjoined from not using the "De Bothezat" name with respect to the contract products, and while it may, perhaps, be required to furnish more detailed audits of its operations, it is these forms of equitable relief to which appellant must turn. To prohibit appellee from engaging generally in the business would be to visit upon it a penalty hardly commensurate with its acts. Cf. Conmar Products v. Universal Slide Fastener Co., Inc., 2 Cir., 172 F.2d 150, 156. This consideration is reinforced by the policy against imposing restraints on competition where the parties themselves have not done so, finding expression in such cases as Measurements Corp. v. Ferris Instrument Corp., 3 Cir., 159 F.2d 590, 593; Kohn v. Elmer, 2 Cir., 265 F. 900, 904; and Eskimo Pie Corp. v. National Ice Cream Co., supra. Of course, there are limits to this policy, but they have been fully recognized for the purposes of this case by the court below, since the decree provided that appellee should have the right to sell "any and all fans, ven-

tilating equipment and other products, *not infringing upon valid patents owned by* defendant after such termination * * *."

Thus, we think the court below properly held these insufficient as defenses to this action and properly granted the motion for a separate trial. Accordingly, the judgment must in all respects be affirmed.

Judgment affirmed.

---

9. See Selwyn & Co. v. Waller, 212 N.Y. 507, 106 N.E. 321, L.R.A.1915B, 160.

10. See 1 Nims, Unfair Competition and Trade-Marks, 1947 Ed., § 13, pp. 73–78, 79–80.

11. Old Dearborn Distributing Co. v. Seagram Distillers Corp., 299 U.S. 183, 194, 57 S.Ct. 139, 81 L.Ed. 109, 106 A. L.R. 1476; Glen & Hall Mfg. Co. v. Hall, 61 N.Y. 226, 230, 19 Am.Rep. 278. See 1 Nims, supra, § 13, p. 78.

