WESTERN GEOPHYSICAL COMPANY OF AMERICA, INC.,
Plaintiff-Appellee,

v.

BOLT ASSOCIATES, INC.,
Defendant-Appellant.

BOLT ASSOCIATES, INC., Third-Party Plaintiff-Appellant,

v.

LITTON INDUSTRIES, INC., Third-Party Defendant-Appellee.

No. 569, Docket 77–7362.

United States Court of Appeals, Second Circuit.

Argued May 10, 1978.
Decided Sept. 1, 1978.

Roland T. Bryan, Stamford, Conn. (Joel E. Lutzker, Thomas N. Twomey, Bryan & Bollo, P.C., Stamford, Conn., of counsel), for appellant.

William J. Doyle, New Haven, Conn. (Shaun S. Sullivan, Wiggin & Dana, New Haven, Conn., of counsel), for plaintiff-appellee and third-party defendant-appellee.

Before HAYS, MANSFIELD and INGRAHAM,* Circuit Judges.

HAYS, Circuit Judge:

Defendant-Appellant, Bolt Associates, Inc. ("Bolt"), appeals from a judgment entered in the United States District Court for the District of Connecticut, Blumenfeld, *Judge,* awarding Plaintiff-Appellee, Western Geophysical Company of America, Inc. ("Western"), damages of $848,544 for Bolt's wrongful termination of an exclusive licensing agreement. Bolt contends that Judge Blumenfeld erred: (1) in ruling that Bolt's termination of Western's exclusive license was not justified by Western's failure to use, or to sublicense others to use, the patented invention that was the subject of the exclusive license; (2) in entering judgment in an amount based on Bolt's actual royalty income rather than on Western's potential earnings had the agreement not been terminated; and (3) in dismissing Bolt's antitrust counterclaims against Third-Party Defendant-Appellee, Litton Industries, Inc. ("Litton"), Western's parent company.

We reject Bolt's arguments in support of these claims, and affirm the judgment of the District Court.

I

In 1961, Bolt[1] filed a patent application on the Pneumatic Acoustical Repeater ("PAR"), an air gun device designed to provide a source of sound for use in underwater seismic exploration. The PAR works in the following manner: Highly compressed air is suddenly released from the PAR into the water, producing sound energy. This sound passes through sediments and is reflected from the ocean bottom. With proper additional equipment for reception and analysis, the bottom structure can be determined from the reflected signals.

Seismic exploration is of two basic types: (1) shallow reconnaissance surveys or oceanographic mapping—providing data needed to map the ocean bottom and to determine its suitability for dredging or structural support, and (2) deep penetration, fine detail exploration—providing data needed to ascertain the nature and formulation of subbottom strata. This latter type of exploration is primarily commissioned by oil companies; the information obtained may

---

\* Hon. Joe McDonald Ingraham, Circuit Judge, U.S. Court of Appeals for the Fifth Circuit, sitting by designation.

1. The following proposed findings of fact, submitted by Bolt to the District Court, indicate the nature of the corporation and the circumstances under which it was initiated:

Bolt was originally formed as a partnership in October, 1960 to operate a machine shop and develop products for the oceanographic and other fields. Originally, it included only Stephen Chelminski, who had had some experience designing and using oceanographic equipment, and John Gilbert and Louis de Geoffroy, engineers trained in other fields.

Bolt was incorporated in 1962. At this time, it had a total of five men, the above named individuals and, in addition, Charles Nizolek and Anthony Delano. All during the years in question until 1966, Bolt was small and depended primarily on Western for its knowledge of the oil exploration business.

Bolt's products, up to the time of the agreement here in issue, included a water bottle for deep sea sampling and the air gun invention. Its principal income came from machine shop jobs. It was not profitable, and the principals lived only on subsistence incomes and private resources. Bolt had no sales force and no personnel having any knowledge of the economics of the petroleum exploration market.

indicate the presence of oil or other minerals in these strata. Before the invention of the PAR (and other nonexplosive sound-creating devices), the primary source of sound for exploration purposes was dynamite or other explosives.

It is undisputed that, in the early 1960's, Bolt was not equipped to exploit the PAR.[2] In April, 1963, Bolt gave Western an exclusive license to use and to sublicense PAR's with chamber volumes of greater than 10 cubic inches and less than 200 cubic inches.[3] Bolt and Western were to share equally in any royalty income. The agreement required Western

> to use its best efforts to promote worldwide licensing and use of the licensed apparatus to government and non-profit institutions during the first two years of this Agreement and hereafter, or at such earlier time as Western may elect, to all other possible sublicensees of such apparatus.

An earlier agreement gave Western the right to a similar license with respect to any improvements or design developments in the 10 to 200 cubic inch range, to inventions relating to PAR's in excess of 200 cubic inches, and to fueled PAR's, if Bolt later developed them. Western gave Bolt $25,-000, one-half of which was to be applied in the development of such devices and improvements.

For reasons that will be examined below, Western did not use the PAR or sublicense its use. In May, 1966, Bolt sent Western a Notice of Termination which purported to terminate Western's exclusive license as of June 30, 1966. The primary ground asserted for this termination was Western's alleged failure to "use its best efforts to promote world-wide licensing and use" of the PAR. A short time later, Bolt refused to permit Western to exercise its options for exclusive licenses with respect to fueled PAR's and PAR's in the over 200 cubic inch range. Immediately following the purported termination of Western's exclusive license, Bolt successfully exploited the PAR; Bolt sold, leased and licensed PARs in the 10 to 200 cubic inch range.

In March, 1967, Western brought suit against Bolt, claiming breaches of both contracts. As noted by the District Court, the resolution of these questions depends primarily on whether Western's conduct during the licensing period justified Bolt's termination of the agreement. Thus, it is necessary to examine the events of this period in some detail.

While the propriety of and motivation for Western's actions are questioned by Bolt, the basic facts are undisputed. During the period from April, 1963, to June 30, 1966, Western neither used nor licensed others to use the PAR in underwater seismic exploration. Initially Western found that the 135 cubic inch PAR gun, which it leased from Bolt for the purpose of determining whether to enter into the exclusive licensing agreement, was not mechanically sound. The device broke down "repeatedly" during testing thereby indicating its inadequacy for seismic exploration, which requires frequent firing over an extended period of time. After obtaining Bolt's permission to manufacture the PAR itself, however, Western entered into the April, 1963, agreement. Western allegedly took this action because it concluded from its tests that the PAR could be competitive with existing non-explosive sound sources if made mechanically reliable. Western hoped to achieve such reliability by redesigning the PAR guns.

In November, 1964, Western successfully tested its redesigned PAR and concluded that the device was mechanically adequate. These tests, however, indicated a "noise" problem, denominated a "bubble pulse" effect, which had not been evident from the

---

2. *See* note 1 *supra.*

3. This exclusive license agreement was attached to a letter agreement entered into on September 14, 1962 and modified on April 11, 1963. The letter agreement provided, *inter alia,* for testing by Western of a leased PAR gun for a three month period. If Western was satisfied with PAR's performance, it could then enter into the exclusive license agreement. Western did so on April 16, 1963.

initial testing: when the air bubble released from the PAR expanded a certain amount, the water pressure outside the bubble became greater than the air pressure inside the bubble and the bubble collapsed, creating an unwanted sound; this sequence could be repeated several times after a single discharge of the PAR gun. These sounds, as well as other "noise" such as sounds caused by the movement of the ship through the water, interfered with the reception of the desired signals, the reflected air gun sounds. In fact, Western found that the "noise" was so great that it made the PAR gun useless for deep penetration seismic exploration; the reflected signals were too weak to be readily distinguishable from the noise.

Western recognized that, even with the "bubble pulse" problem, the PAR gun was probably useful for shallow reconnaissance surveys or oceanographic mapping. However, Western did not attempt to sublicense the PAR to others for that purpose. Western claimed, and the District Court found, that, by the time the PAR was adequately redesigned, the market for such exploration was leveling off and was about to decline. Western concluded that the PAR could not successfully compete with established sound sources for this diminishing market.

Western apparently decided that the only way to successfully exploit the PAR would

be to improve the PAR and/or the equipment used to receive its signal and/or the equipment used to analyse the data received. Thus, as the District Court found, Western expended substantial amounts of time and money,[4] between November, 1964, and the date of the purported termination of its exclusive license, in various attempts to develop a system in which the PAR could be employed in deep penetration seismic exploration.[5] However, Western was not successful during this period. One important piece of peripheral signal-receiving equipment, the long Paslay streamer cable,[6] did not become generally available to the industry until March, 1966. Another device, useful in separating "noise" from desired signals by digital analysis, became available at an even later date.

During this period in which Western sought to develop a complete, useful system for deep penetration seismic exploration, Western did not attempt to sublicense the PAR to other companies engaged in the same work. The reasons for this decision were recounted by the District Court in its Memorandum and Order on the question of liability:[7]

The customers of companies who, like Western, conduct marine seismic explorations are large and successful oil companies who put accent on the objective cer-

4. *Western Geophysical Co. v. Bolt Associates, Inc.,* 173 U.S.P.Q. 284, 288 (D.Conn.1972).

5. *Id.* at 287–89. The court stated:
   One possible method of making the signals more reliable was thought to be to increase the acuity of the sensing devices. Another idea was to record the sound from each shot at a number of receiving positions; another was to try to eliminate or modify the bubble at its source. Scientists and expert technicians at Western worked together to develop and to implement these ideas.
   *Id.* at 287–88 (footnotes omitted).

6. *Id.* at 288. In a footnote, the court stated:
   In order to increase the signal to noise ratio, a seismic system had to be devised that generated significantly less noise than the system being used with explosive sound sources. The long, neutrally buoyant, pressure-sensing Paslay streamer cable towed by the ship was suitable for that. A pressure-sensing device, unlike a velocity sensing sys-

tem, is not sensitive to motion and can be used in a continuous tow. A long Paslay cable can accommodate at least twenty-four information channels, with each channel having twenty to fifty individual detector devices. Thus, one can receive 2400 separate signals for boat travel of one cable length, which can be corrected to compensate for the fact that the various detectors are at different distances from the "shot." With a high repetition rate of shots, signals from a common depth point can be "stacked" to enhance the signal sufficiently to produce a seismic record equivalent to one large dynamite shot. However, the long Paslay streamer cable patented by Seismic Engineering Co. was not available to anyone in the contract exploration business other than G.S.I. until March 1966, when the patent expired.
   *Id.* at 288 n.13.

7. *Id.* at 288.

tainty of the information they are paying to obtain. They pay out their money to an exploration company at the rate of about $100,000 a month for a seismic survey in the expectation of receiving one that is finely detailed and accurate. The cost of drilling a well may run as high as a million dollars. In most cases, the oil companies specify the sound source to be used by the exploration company. If surveys made with the use of PAR did not measure up to what they were paying for, they would be quick to move elsewhere and slow to return.

Thus, Western claimed, there was no market during this period for the PAR gun alone; only a complete system would be commercially successful.

It is undisputed that, during the period of the exclusive license, Western kept Bolt informed of its efforts to improve the mechanical reliability of the PAR and its subsequent efforts to eliminate the "bubble pulse" effect and/or to develop a system wherein the PAR could be usefully employed. Apparently, until the Notice of Termination, Bolt did not inform Western of Bolt's dissatisfaction with Western's performance.[8] Moreover, during the period immediately prior to notification of termination, Bolt began negotiating to license PAR's in the 10 to 200 cubic inch range to Geophysical Services, Inc. ("GSI"). Bolt did not send GSI to Western to obtain a sublicense, but told GSI to ignore Bolt's exclusive agreement with Western because it might be terminated in the near future.

In the District Court, Western argued that the termination was unjustified; its attempts to eliminate the "bubble pulse" effect and/or to develop more sophisticated peripheral equipment was sufficient to satisfy its contractual obligation to use "best efforts." Bolt countered that Western's "systems" approach was insufficient under the agreement. Apparently, Bolt considered the "bubble pulse" effect a product of Western's redesign of the PAR, and not a defect inherent in the patented device itself. Moreover, Bolt claimed that other

exploration companies, Western's competitors, already possessed, or could have developed, adequate peripheral equipment. Thus, Bolt argued, Western should not be permitted to excuse its failure to use or sublicense by citing the "bubble pulse" problem and Western's inability to develop a workable system. Bolt claims that it should not suffer for Western's incompetence, on one hand, and Western's desire not to be subject to competition, on the other.

In conjunction with this, Bolt also raised antitrust defenses against Western—attempt to monopolize, conspiracy to monopolize, and illegal acquisition of an asset in violation of Clayton Act § 7—and brought antitrust counterclaims against Western and Litton—conspiracy with intent to monopolize and to lessen competition in violation of Sherman Act §§ 1 and 2 and Clayton Act § 7, conspiracy to group boycott Bolt, conspiracy to suppress the PAR in violation of Sherman Act § 2, and additional allegations of such conspiracies in violation of Sherman Act §§ 1 and 2 and Clayton Act § 7. Apparently, Bolt did not attribute Western's failure to sublicense to business judgment but rather to selfish, anticompetitive motives: Western could not use the PAR because Western did not possess adequate peripheral equipment; thus, it would not let any of its competitors have the PAR until it did possess such equipment. Bolt further claimed that Western knew that its competitors already had adequate peripheral equipment and that, thus, it obtained the exclusive license with the intention of suppressing the PAR. To support this, Bolt cited Western's acquisition of exclusive licenses to other devices similar to the PAR. This, Bolt claimed, indicated a scheme to suppress development in the entire area.

The District Court found that Bolt's purported termination of the exclusive license and its refusal to permit Western to enter into exclusive licenses with respect to fueled PAR's and PAR's in the over 200 cubic inch range were not justified. The court

8. *Id.* at 289.

construed "best efforts" to mean "active exploitation in good faith. . . ." *Neenan v. Otis Elevator Co.,* 194 F. 414, 417 (S.D.N.Y.1911), *aff'd,* 194 F. 414, 419 (2d Cir. 1912). Using this definition, the court determined that Western's efforts to solve the problems with the PAR satisfied its obligation to use its "best efforts"; Western was not required to use or to attempt to license others to use the PAR before Western developed appropriate peripheral equipment. The court concluded that Western acted "in complete good faith" and exercised "sound business judgment" throughout the licensing period: [9]

> To have used the PAR as a sound source before it could be made to yield the desired quality of seismic survey would have seriously jeopardized the success which both parties sought. No exploration company would have been so naive as to launch this new device, leaving the problems it presented to be solved by others. Western was not forced to pawn off an inferior product which could not meet competition. Cf. *Bull v. Logetronics, Inc.,* 323 F.Supp. 115, 132 (E.D.Va. 1971). . . . Big problems which were not old and familiar faced anyone who attempted to use the PAR earlier than when [Bolt] terminated the license.

As indicated above, and specifically stated at another point in its opinion,[10] the District Court found that certain pieces of equipment essential to solution of the "noise" problems were not available until about the time that Bolt terminated the agreement.

Except for Bolt's counterclaim for patent infringement, which had been reserved for separate trial, the District Court dismissed all of Bolt's counterclaims and defenses. The court found that Bolt had offered no evidence of a purpose on the part of Western or Litton to exclude competition by suppressing the PAR. It also determined that Bolt had no standing to raise most of its antitrust defenses and counterclaims because Bolt was not a competitor of Western. Moreover, the court stated, "issues dispositive of all of the antitrust counterclaims were necessarily resolved against Bolt at this trial." Apparently, the court concluded that the finding that Western had acted in "good faith" precluded a finding that Western acted with anticompetitive intent.

A separate hearing on the question of damages was held before a Special Master. The Special Master filed a proposed ruling on damages in which he found that Western had sustained damages of $848,544, including prejudgment interest. He arrived at this figure by beginning with the $1,505,837 gross income Bolt had received as of December 31, 1973, from licensing the PAR. He then calculated $752,918 as Western's 50% share of sublicensing fees under the exclusive licensing agreements and deducted $127,918 as expenses Western would have incurred in concluding these sublicenses. Finally, he determined and added prejudgment interest. The District Court entered judgment against Bolt in this amount.

Bolt appeals these rulings. It argues that Western's actions did not satisfy its obligation to use "best efforts" to sublicense the PAR; that its antitrust counterclaims and defenses should not have been dismissed; and that the Special Master erred in basing Western's damages on Bolt's licensing income without requiring proof that Western would have licensed and would have earned such profits.

II

Bolt supplies three arguments to support its contention that the District Court erred in ruling that Western's obligations to use its "best efforts" were met by Western's attempts to develop its own system for commercial use of the PAR: (1) Western did not, by its actions, comply with the specific contractual requirement that it sublicense the PAR; (2) the "systems" approach approved by the District Court would permit extension of Western's exclusive control over the patented device in contravention of public policy; and (3) the

---

**9.** *Id.* at 288–89.

**10.** *Id.* at 288.

"systems" approach approved by the District Court prevented other companies from using the PAR even though these companies had the technological capability to do so. None of these arguments, however, convince us that the District Court erred in finding that Bolt's termination of Western's exclusive license was not justified by Western's failure to use or sublicense the PAR.

■ The exclusive licensing agreement did not, by its terms, mandate that Western use or sublicense PAR. Rather, it required Western "to use its best efforts to promote worldwide licensing and use" of PAR after the initial two year period of exclusivity. As noted above, the District Court construed this language as requiring "active exploitation in good faith." This obligation, the court determined, was satisfied by Western's actions during the period in question: Western made a good faith business judgment that the best way to "promote" sublicensing would be to develop a system in which the PAR could be properly employed; then, Western actively pursued this plan by attempting to improve the PAR and to develop a system of peripheral equipment. While it is clear that Western could have attempted to sublicense at the same time, the District Court specifically ruled that Western was not, by its contract, required to do so.

We agree with the District Court's construction of the language of the contract. The phrase "best efforts to promote licensing" indicates a degree of discretion in the selection of the promotional plan; no absolute requirement that Western sublicense can be read into these words. The standard by which the District Court determined whether "best efforts" had been employed, "active exploitation in good faith," was also proper.

■ The District Court rulings with respect to Western's performance of its contractual obligations are findings of fact and should not be disturbed unless "clearly erroneous." Fed.R.Civ.P. 52(a). Not only is the finding that Western used "best efforts" not "clearly erroneous," but it is supported by substantial evidence in the record.

Western did not "sit on its hands" during the period between 1963 and 1966; it expended vast sums to develop peripheral equipment and/or solve the "noise" problem in some other manner.

The finding that Western satisfied its contractual obligations is also supported by Bolt's own conduct during this period. Although Bolt was aware of Western's "systems approach" and of Western's failure to use or sublicense the PAR, Bolt did not complain to Western that it was not complying with the requirements of the contract. Moreover, Bolt did not send GSI to Western when GSI indicated interest in obtaining PAR's in the 10 to 200 cubic inch range; Bolt told GSI to ignore Western's exclusive license.

■ Bolt's argument derogating, on public policy grounds, the District Court "systems" approach, is equally unconvincing. Clearly, it is desirable that a licensee's period of exclusive use be short; the purpose of granting the government-sanctioned 17 year monopoly of a patent is to improve technology by requiring the patentee, in exchange for this monopoly, to disclose his invention to the world. However, not every failure to use or sublicense others to use violates public policy. As the District Court noted, a licensee need not try to sublicense an inferior or unmarketable product. See 49 Mich.L.Rev. 738, 752 (1951); *Bull v. Logetronics, Inc.,* 323 F.Supp. 115, 132 (E.D. Va.1971). *Cf. American Machine & Metals, Inc. v. DeBothezat Impeller Co., Inc.,* 180 F.2d 342, 345–46 (2d Cir.), *cert. denied,* 339 U.S. 979, 70 S.Ct. 1025, 94 L.Ed. 1383 (1950); *Mechanical Ice Tray Corp. v. General Motors Corp.,* 144 F.2d 720, 725–26 (2d Cir. 1944), *cert. denied,* 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945); *Parev Products Co., Inc. v. I. Rokeach & Sons, Inc.,* 124 F.2d 147, 150 (2d Cir. 1941) (best efforts obligation does not preclude licensee from using a different device if licensee cannot meet competition with licensed device). Moreover, this is not a case where the exclusive licensee did nothing to promote the licensed device, or where he gave up trying to promote the device after a short time. West-

ern worked diligently on its planned system until it received the Notice of Termination. The District Court did not rule that a "systems" approach would always satisfy contractual obligations to use "best efforts" to sublicense; it merely held that, on the facts of this case, the contractual duty was satisfied. Thus, the court did not establish a rule which would protect dilatory exclusive licensees.

Bolt's third argument is that Western's conduct deprived other companies, "who had the demonstrated capability to use the patented invention," from using it. We need not decide whether Western's competitors did have such capability at an earlier time than Western.[11] The question here is not whether Western acted in the "fairest" way, but whether its conduct justified Bolt's termination. As noted above, that question was properly decided in Western's favor.

### III

Both parties agree that the law of New York governs on the question of damages. They differ, however, on the substance of that law as applied to the situation in this case. First, Bolt claims that the possibility that Western would have received profits had the agreement not been terminated was too contingent to provide the basis for a monetary award. Bolt alleges that, in light of Western's prior failure to license the PAR and obtain profits, Western should have been required to show that it would, in fact, have licensed and earned profits had the agreement not been terminated. Second, Bolt argues that by basing Western's damages on Bolt's earned profits, the court put the burden of proof on Bolt to show that Western would not have derived such profits. This, Bolt argues, misallocated the burden of proof with respect to the issue of damages; this burden should be on the plaintiff. Third, Bolt argues that it cannot be assumed that Western would have earned the same profits that Bolt

earned. Bolt achieved a high level of profits as a result of its own strenuous efforts. Had Western been promoting the device, Bolt might not have actively participated. Finally, Bolt argues that Western should not have been permitted to estimate its likely expenses of starting and maintaining a licensing program since Bolt was not permitted to discover expenses actually incurred by Western in other licensing programs.

■ The proper measure of damages for breach of contract is "the amount necessary to put the plaintiff in as good a position as he would have been if the defendant had abided by the contract." *Perma Research & Development Co. v. Singer Co.*, 402 F.Supp. 881, 898 (S.D.N.Y.), *aff'd*, 542 F.2d 111 (2d Cir. 1975), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977). This award can include damages for lost profits, even if the breach occurred before any profits were realized. *See, e. g., Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 455 (2d Cir. 1977); *Perma, supra*, 402 F.Supp. at 898; *For Children, Inc. v. Graphics International, Inc.*, 352 F.Supp. 1280, 1284 (S.D.N.Y.1972). *Cf. Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir.), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1964). In *Perma, supra*, 402 F.Supp. at 898, the court listed three criteria which must be satisfied before lost profits can be awarded in such "new venture" situations:

the loss of prospective profits are the direct and proximate result of the breach; profits were contemplated by the parties when they entered the contract; and there is a rational basis on which to calculate lost profits.

Bolt argues that damages cannot be awarded here because they are "speculative." The Supreme Court has, however, in another context, defined "speculative damages" as those damages which

---

11. Bolt argues that the Paslay streamer, which the District Court found a requisite of a useful system employing the PAR, *see* note 6 and

accompanying text *supra*, was not essential to every system, but only to Western's *planned* system.

are not the certain result of the wrong, not . . . those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). And the New York Court of Appeals has indicated a similar attitude:

> [W]hen it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of damage which he caused is uncertain.

*Wakeman v. Wheeler & Wilson Mfg. Co.,* 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886); *Randall-Smith, Inc. v. 43rd St. Estates Corp.,* 17 N.Y.2d 99, 105–06, 268 N.Y.S.2d 306, 312, 215 N.E.2d 494, 498 (1966). *See also Lee, supra,* 552 F.2d at 455–56; *Perma, supra,* 402 F.Supp. at 899. Moreover, it is well-established that the breaching defendant, who has created the uncertainties as to damages, must bear the risk of these uncertainties. *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Perma, supra,* 542 F.2d at 116; *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 565 (2d Cir. 1970).

We recognize that the judgment entered against Bolt will work an extreme hardship on that company. On application of the above-cited law and policy considerations to the facts of this case, however, we conclude that the ruling on damages should not be disturbed.

■ The first and second *Perma* criteria for awarding damages for the lost profits of a new venture are clearly met. First, the possibility of profits from the sublicensing scheme was cut off when Bolt terminated the agreement. Thus, damages are not "speculative"; the loss was "the direct and proximate result of the breach." Second, "profits were contemplated by the parties when they entered the contract." There is no other arguable purpose for the exclusive licensing agreement than that the PAR be exploited financially.

Bolt argues strenuously, however, that the third *Perma* criterion—"a rational basis on which to calculate the lost profits"—is not satisfied. Bolt claims that there is no evidence to indicate that Western would ever have sublicensed and earned profits; Western's "systems" approach might never have produced a marketable device. Moreover, Bolt contends that there is no rational relationship between the profits Bolt earned after termination and the profits Western might have earned if Bolt had not terminated. Bolt sought and obtained customers for the PAR by shooting the air gun into the customers' signal-receiving equipment. Western, under its "systems" approach, would not have proceeded in the same manner; it would have sought customers for the tied-in license to a complete system in which the PAR was merely a component.

Both the District Court and the Special Master found that, if Bolt had not terminated the exclusive agreement, Western would have licensed the PAR and earned profits from this licensing. This finding of fact was not clearly erroneous. It appears from the record that Western would have solved the noise problem shortly after June, 1966. Western also had made certain moves preparatory to introducing the PAR into the market.[12] Moreover, as found by the Special Master, Bolt's own success in licensing indicates that a market for the PAR existed during the period immediately following termination of the exclusive licensing agreement.

---

12. At a meeting of the Society of Exploration Geophysicists International, Western presented a formal paper on the PAR, and at a meeting of the Marine Technology Society, Western distributed about 900 copies of a record section made during the 1962 tests of the PAR. Western also demonstrated the PAR to several companies.

■ The only remaining barrier to recovery of lost profits is uncertainty as to the amount to be awarded. And, as discussed above, such uncertainty should not bar recovery as long as there is a rational basis for calculating damages. *Perma, supra.* As this court has ruled, it is not improper to put evidence of a defendant's post-breach profits before the jury.

> Although such evidence did not establish damages in the form of lost profits exactly to the penny, it did suffice to form a reasonable basis upon which the jury could properly conclude the amount of plaintiffs' lost profits occasioned by defendants' breach . . . . .

*Flexitized, Inc. v. National Flexitized Corp.,* 335 F.2d 774, 779 (2d Cir. 1964). Thus, the Special Master did not err in basing the award on the profits that Bolt earned from licensing PAR's in the 10 to 200 cubic inch range. This basis for recovery can certainly be termed sufficiently "rational" to satisfy the *Perma* criteria. This is not a case where the breach prevented a contemplated business from beginning; it merely shifted the reins from Western's hands to Bolt's. It is rational to assume that the nature of the business did not change thereby. This is a much more realistic basis for the damage calculation than any hypothetical plan of Western's for future marketing of the PAR. *See Autowest, supra,* 434 F.2d at 563–64; *Perma, supra,* 402 F.Supp. at 899–900.

Bolt's arguments must also fail because Bolt must bear the risk of the uncertainties caused by its wrongful termination. And, while it is arguable that Western might not have earned as much as Bolt did, it is more likely that Western would have done at least as well. Western was a member of the industry with many more contacts than Bolt. It can also be assumed that Bolt would have pushed hard for sublicensing by sending to Western the companies which approached Bolt seeking licenses.

Finally, strong public policy arguments can be made to support the damage findings of the Special Master which were adopted by the District Court. If damages were not based on Bolt's profits, there would be no way to calculate the loss; Western had not yet earned any profits and Western apparently had no projected marketing scheme from which future profits could be estimated. Thus, Bolt would achieve a benefit from terminating the contract before Western began to achieve profits. The District Court found that the PAR was just becoming marketable, because of industry-wide technological advances and general availability of certain receiving equipment, at the time of Bolt's termination. Bolt should not be rewarded for pulling the rug out from under Western at the instant before Western would have been able to capitalize on its improvements in the PAR and on the changes in the market.

■ Nor do Bolt's other objections to the damage determination convince us that the judgment should be disturbed. Bolt argues that, by basing the damage calculation on Bolt's earned profits instead of requiring Western to supply evidence concerning the amount of Western's potential profits, the court created a presumption of profits which Bolt was then required to rebut. This argument, however, misconceives the nature of the burden of proof in these damage cases. Once the plaintiff has demonstrated that it would have earned profits and has supplied a rational basis upon which those profits can be calculated, it has sustained its burden of proof. The defendant may, if it wishes, seek to demonstrate that the plaintiff would have earned less. But it cannot complain about being afforded that opportunity.

■ The Special Master and the District Court also did not err in allowing Western to estimate its likely expenses of licensing. *Cf. Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918 (2d Cir. 1977). Moreover, Bolt had extensive discovery on this point and was still unable to rebut Western's prediction.

## IV

Finally, Bolt contests the District Court findings that Bolt's antitrust defenses and

counterclaims are meritless and that Bolt lacks standing to raise these points. We find, however, that the District Court did not err in dismissing these defenses and counterclaims.

As found by the District Court, Bolt offered no evidence to support its allegations that Western obtained the exclusive license with the purpose of suppressing the PAR and other similar devices. Moreover, the District Court finding that Western had, at all times, acted in good faith, is inconsistent with any determination that Western conspired with Litton either to group boycott Bolt or to commit any other antitrust violation. Finally, Bolt lacked standing to raise most of its antitrust counterclaims and defenses because it was not within the "target area" of the alleged anticompetitive behavior. *See, e. g., Long Island Lighting Co. v. Standard Oil of California,* 521 F.2d 1269 (2d Cir.), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1975); *Nassau County Ass'n of Agents, Inc. v. Aetna Life & Cas. Co.,* 497 F.2d 1151 (2d Cir.), *cert. denied,* 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974); *GAF Corp. v. Circle Floor Co., Inc.,* 463 F.2d 752 (2d Cir. 1972), *cert. dismissed,* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Bolt is not a competitor of Western in the seismic exploration industry, and thus, cannot be the entity at which a conspiracy to suppress the PAR and other similar devices would be aimed. And, as to Western's acquisition of other sound-producing devices, it is sufficient to note that Bolt could not have been injured by such conduct; by suppressing other sound sources Western could only promote the PAR.

The District Court decision is affirmed in all respects.